# Illinois Official Reports

## Appellate Court

***BMO Harris Bank N.A. v. Joe Contarino, Inc.*, 2017 IL App (2d) 160371**

| | |
|---|---|
| Appellate Court Caption | BMO HARRIS BANK N.A., f/k/a Harris N.A., as Assignee of the Federal Deposit Insurance Corporation, as Receiver for Amcore Bank, N.A., Plaintiff-Appellant, v. JOE CONTARINO, INC., d/b/a Contry Homes of Illinois, JOE CONTARINO, UNKNOWN OWNERS, and NONRECORD CLAIMANTS, Defendants (Joe Contarino, Inc., d/b/a Contry Homes of Illinois, and Joe Contarino, Defendants-Appellees; Midwest Community Bank, Rockford Bank & Trust, and Byron Bank, Intervenors-Appellees). |
| District & No. | Second District<br>Docket No. 2-16-0371 |
| Filed | March 23, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 13-CH-1148; the Hon. Ronald A. Barch, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Martin J. Wasserman and Kurt M. Carlson, of Carlson Dash LLC, of Chicago, for appellant.<br><br>Donald Q. Manning, of McGreevy Williams P.C., of Rockford, for appellee Joe Contarino, Inc. |

James E. Stevens, of Barrick, Switzer, Long, Balsley & Van Evera, LLP, of Rockford, for appellee Joe Contarino.

Richard G. Larsen, of Springer Brown, LLC, of Wheaton, for appellee Midwest Community Bank.

Kim M. Casey, of Holmstrom & Kennedy, P.C., of Rockford, for other appellees.

Panel            JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

## OPINION

¶ 1      Plaintiff, BMO Harris Bank N.A. (BMO), f/k/a Harris N.A., as assignee of the Federal Deposit Insurance Corporation, as receiver for Amcore Bank, N.A., filed a mortgage-foreclosure complaint against defendants, Joe Contarino, Inc., d/b/a Contry Homes of Illinois (JCI), Joe Contarino, unknown owners, and nonrecord claimants. BMO obtained a $1.5 million judgment against JCI and Contarino. As relevant here, in supplementary proceedings, BMO caused the issuance of a citation to discover assets to JCI (JCI citation) and, subsequently, a third-party citation to discover assets to Briargate Management LLC (Briargate citation), a property management company that collected rents for the JCI properties. Midwest Community Bank (Midwest), Rockford Bank & Trust (Rockford), and Byron Bank (Byron) (collectively Adverse Claimants) sought to intervene in the supplementary proceedings to assert adverse claims on rents Briargate held. They claimed that their interests in the rents (via assignment-of-rents provisions in their mortgages on JCI properties and separate forbearance agreements) were superior to any interest BMO had by virtue of the JCI and Briargate citations.

¶ 2      The trial court ruled in Adverse Claimants' favor and against BMO, finding that BMO did not have priority as to the rents. Specifically, the court found, pursuant to section 31.5 of the Conveyances Act (765 ILCS 5/31.5 (West 2014)), that rental agreements such as the forbearance agreements here are beyond the reach of a third party such as BMO. BMO appeals. We affirm.

¶ 3                         I. BACKGROUND

¶ 4      Contarino was sole owner and president of JCI. JCI's assets included several income properties that were managed by Briargate, which was owned by Contarino's wife. Briargate collected rents for the properties and transferred them to JCI.

¶ 5        On August 27, 2013, BMO filed a complaint against defendants, seeking to foreclose on four mortgages on several lots in subdivisions in Rockford, Roscoe, and Machesney Park. The complaint also included counts alleging breach of a promissory note (executed by JCI) and breach of a guaranty (by Contarino). On April 11, 2014, the trial court entered foreclosure judgments. On August 27, 2014, the trial court entered judgment in BMO's favor and against JCI and Contarino in the amount of $1,569,610.45 each. It also confirmed sales of the lots and issued orders of possession.

¶ 6        On November 7, 2014, BMO initiated supplementary proceedings to enforce the judgment and filed the JCI citation. The citation was served on JCI on November 20, 2014, and was subsequently extended several times. See Ill. S. Ct. R. 277(f) (eff. Jan. 4, 2013) (citation automatically terminates six months from the date of the respondent's personal appearance or upon expiration of extensions entered "as justice may require").

¶ 7        On August 20, 2015, BMO filed the Briargate citation, and Briargate was served on August 28, 2015.

¶ 8        In its response, Briargate asserted that it did not hold any JCI assets and that it was a mere management agent and conduit for Adverse Claimants, secured lenders that were entitled to the rents. Subsequently, Adverse Claimants moved to intervene to assert their adverse claims, based on rent-assignment agreements that predated BMO's citations.

¶ 9        First, on September 29, 2015, Midwest moved to intervene in the supplementary proceedings to assert an adverse claim to certain rents held by Briargate. 735 ILCS 5/2-1402(g) (West 2014). Midwest argued that, on September 15, 2015, it had filed a complaint in Boone County to foreclose its mortgage (which was recorded on October 7, 2010, and contained an assignment-of-rents clause) on real property at 413 Old Orchard Lane in Poplar Grove. In that action, it had asserted that it was entitled to possession of the property for the purpose of collecting rents. The trial court granted the motion to intervene on October 1, 2015, and, further, gave Byron and Rockford seven days to file their claims.[1] Subsequently, as noted below, Midwest asserted that, pursuant to a December 2014 forbearance agreement between it, JCI, and Briargate, Briargate began transmitting directly to Midwest the rents on the JCI-owned properties subject to Midwest's mortgages.

¶ 10       Second, on October 8, 2015, Byron moved to intervene to assert an adverse claim on rents Briargate held. Byron asserted that it had a superior interest in the rents by reason of its mortgages (containing assignment-of-rents clauses) on JCI-owned properties *and* by reason of a December 2014 forbearance agreement between Byron, JCI, and Briargate, according to which, beginning December 1, 2014, Briargate began transmitting the rents on those JCI-owned properties directly to Byron.

¶ 11       Third, also on October 8, Rockford moved to intervene to assert an adverse claim on rents held by Briargate, similarly arguing that its interest was superior by reason of its mortgages on JCI-owned properties and by reason of an August 20, 2013, forbearance agreement between it, JCI, and Briargate, according to which Briargate began transmitting the rents on those properties directly to Rockford.[2]

---

[1]Midwest filed its own responsive brief in this appeal.

[2]Byron and Rockford jointly filed a responsive brief in this appeal.

¶ 12                              A. Trial Court Orders

¶ 13        On December 16, 2015, a hearing commenced on the adverse claims. On January 13, 2016, the trial court issued its memorandum of decision and order with respect to the Briargate funds.

¶ 14        As to Rockford, the trial court rejected BMO's claim that Briargate's transmittal of rents directly to Rockford violated the restraining component of the JCI and Briargate citations. It found that the forbearance agreement between JCI, Briargate, and Rockford was an enforceable contract modification that predated BMO's judgment and the JCI and Briargate citations. The court noted that, prior to BMO's judgment, Rockford enjoyed the benefits of secured contract rights, including the right to foreclose on JCI properties in the event of a default. In 2013, rather than pursue foreclosure, Rockford entered into a separate agreement—the forbearance agreement—that contractually obligated Briargate to transmit rents from JCI properties directly to Rockford. Rockford, the court found, forwent its right to foreclose and/or pursue receivership, and JCI contracted away its right to receive rents on the properties implicated by the mortgages. The court noted that the forbearance agreement did not run afoul of the rents-and-profit doctrine because the contract dictated that all management expenses were to be deducted before any net rents were transmitted to Rockford. See *Comerica Bank-Illinois v. Harris Bank Hinsdale*, 284 Ill. App. 3d 1030, 1034-35 (1996) (rent assignment unenforceable absent actual or constructive possession by lender, the latter of which must include court authorization; public policy seeks to prevent mortgagee from leaving the mortgagor and tenants without resources for maintenance or repair). Finally, the court rejected BMO's assertion that the forbearance agreement violated the restraining provisions of the JCI and Briargate citations, distinguishing case law BMO cited that addressed rent assignments. See *Comerica*, 284 Ill. App. 3d at 1034-35; *In re Wheaton Oaks Office Partners Ltd. Partnership*, 27 F.3d 1234, 1241, 1245 (7th Cir. 1994) (lender seeking to enforce rent assignment will usually have to obtain preforeclosure possession by being placed in actual possession or through appointment of receiver; mortgagee must take certain steps to enforce lien; "failure to enforce an assignment of rents does not destroy the legal existence of an effective, enforceable security interest in those rents which came into being upon execution and was perfected upon recordation"); *In re J.D. Monarch Development Co.*, 153 B.R. 829 (Bankr. S.D. Ill. 1993) (lender seeking to enforce rent assignment must first pursue debtor-in-possession status).

¶ 15        Turning to Byron, the trial court overruled Briargate's objection to document discovery concerning rents it transmitted to Byron. The court determined that Byron's adverse claim reflected that its forbearance agreement with JCI was executed on December 1, 2014. The JCI citation was filed on November 7, 2014, and JCI appeared of record no later than November 24, 2014. Thus, the forbearance agreement was executed *after* the JCI citation's restraining provision came into effect. The court ordered Briargate to supplement its citation production to include records of all rent transmittals to Byron.

¶ 16        As to Midwest, the trial court reserved ruling on Briargate's objection to document discovery concerning rental payments it transmitted to Midwest. The court noted that it was not clear whether the forbearance agreement between JCI and Midwest was executed before or after BMO filed the JCI citation. It directed JCI, Briargate, and Midwest to furnish to BMO all documentation concerning the execution date of the forbearance agreement and directed Briargate to supplement its citation production to include records of all rent transmittals to Midwest.

- 4 -

¶ 17    Finally, the court overruled Briargate's objection that the Briargate citation was untimely under the six-month, automatic-termination provision in Rule 277(f).

¶ 18                    B. Ruling on BMO's Motion to Clarify and Reconsider

¶ 19    On February 12, 2016, BMO moved to clarify and reconsider, arguing that the court misapprehended the facts. Specifically, it argued that (1) as to Rockford, the court was mistaken as to the timing of the receipt of funds, as BMO was the only party with a lien on the funds currently held by Briargate; (2) as to Rockford, the court misstated the law in holding that a forbearance agreement (which, BMO claimed, gives rise only to a contractual claim, not a lien, on collected rents) takes priority over a lien right; and (3) as to Rockford, even if Rockford's claim was superior to BMO's claim, the forbearance obligations were never proved up and JCI might not owe Rockford any funds, due to a subsequent consent foreclosure judgment.

¶ 20    On March 16, 2016, JCI and Briargate filed a response to BMO's motion, noting that section 31.5 of the Conveyances Act, which was enacted in 1996 (*i.e.*, after BMO's proffered cases were decided), controlled the issue of priority between Adverse Claimants and BMO. Specifically, they argued, the statute dictated that Adverse Claimants were entitled to the rents at every juncture of the case, including postjudgment and postcitations, because Adverse Claimants exercised their rights to collect the rents. JCI and Briargate argued that the issue was not about priorities between forbearance agreements and citation liens. In their view, any agreement by which a bank enforced a recorded assignment of rents trumped a citation lien. That is, so long as Adverse Claimants established that they had recorded assignments of rents and then directed the rents to be paid pursuant to the assignments, Adverse Claimants had priority over BMO. See *West Bend Mutual Insurance Co. v. Belmont State Corp.*, 712 F.3d 1030, 1034-35 (7th Cir. 2013) (reviewing Illinois law and noting that a lockbox arrangement or other direct payment system constitutes sufficient enforcement of an assignment of rents). JCI and Briargate also asserted that a claim by BMO for rents due to Adverse Claimants could have arisen only if BMO had sought a turnover order for the rents or sought its own receiver. Had it done so, they argued, BMO's claim would have jumped ahead until Adverse Claimants asserted their assignments.

¶ 21    In its response, Rockford relied on the Conveyances Act, as did Midwest (in its separate response), which also noted that it had provided to BMO the court-ordered documentation.[3] As to lien priority, Midwest argued that, when it set up the direct-payment system, it was asserting its rent assignment. At that time, BMO had not sought a turnover of any of the rents, and therefore, Midwest's lien was superior to BMO's because Midwest asserted its rights to the rents before BMO perfected the citation lien. According to Midwest, since the recorded mortgage and rent assignment gave it priority over a third party such as BMO, Midwest's interest in the rents was prior in both right and time to any claim by BMO based upon the citations. Midwest requested that the court find that BMO had no right to the rents due to Midwest.

---

[3]Midwest asserted that, starting in December 2014, principal and interest payments were paid directly to Midwest. After the Briargate citation (on August 20, 2015), the September payment was placed on hold pending a court hearing. At a September 29, 2015, hearing, Midwest asserted, Midwest was placed in possession and it demanded (and was given) the September payment.

¶ 22    On April 21, 2016, the trial court issued a written order, denying the motion to clarify and reconsider and finding that Adverse Claimants held liens superior to BMO's. The court noted that it previously addressed the cases upon which BMO relied. It also noted that there was no authority addressing the effect of a citation lien on a previously executed forbearance agreement. The court reiterated its previous finding that the forbearance agreements "were legally enforceable contractual agreements manifestly distinct from the assignments of rent agreements at issue in the cases relied upon by BMO." As to the prove-up issue, the court rejected it, noting that the existence of the forbearance agreements was not disputed and that BMO had cited no authority in support of its argument, which it asserted for the first time in its motion to clarify and reconsider. Further, case law instructed that "an express pledge of rents is not extinguished by a foreclosure sale which merges the title and the debt in the same party." *In re Randall Plaza Center Associates, L.P.*, 326 B.R. 133, 141 (Bankr. N.D. Ill. 2005). Accordingly, the court denied BMO's motion to clarify and reconsider.

¶ 23    The court granted JCI and Briargate's request for clarification, finding that section 31.5 was added to the Conveyances Act in 1996 to address the holdings in *Wheaton Oaks*, *J.D. Monarch*, and *Comerica*. According to the court, those cases held that a lender may not collect rents directly under a rent-assignment agreement until the lender has first attained mortgagee-in-possession status or secured the appointment of a receiver. Section 31.5, the court determined, declares that rent-collection agreements, such as lockbox arrangements or the forbearance agreements in this case, "are beyond the reach of any third-party claims that are perfected or arise thereafter." Furthermore, the court found that, even if the statute is ambiguous on this point, the legislative history dictated that the legislature intended to override the case law finding that the recording of an assignment of rents alone is insufficient to defeat priority claims by subsequent lenders and lien claimants. See 89th Ill. Gen. Assem., House Proceedings, May 8, 1995, at 180-81 (statements of Representative Biggert) (noting that "court decisions have been highly inconsistent" and that most, but not all, courts have held that recording is sufficient).

¶ 24    The court summarized that, pursuant to section 31.5, Adverse Claimants' claims "trumped" BMO's claim to the rents generated by the JCI-owned properties (prior to BMO's judgment, between the judgment and the JCI and Briargate citations, and between the JCI and Briargate citations and Adverse Claimants' securing mortgagee-in-possession status).

¶ 25    Next, the trial court addressed, in the alternative, the effect of a ruling that the forbearance agreements here are indistinguishable from the rent-assignment agreements in *Wheaton Oaks*, *J.D. Monarch*, and *Comerica*. The trial court found that those cases stand for the proposition that a judgment creditor can establish an entitlement to collect rents by obtaining possession of a mortgagor's property before the mortgagee holding a previously recorded rent assignment takes steps to enforce its rights through foreclosure or the appointment of a receiver. It further noted that, to unseat a priority lienholder's right to receive rents, the judgment creditor or subordinate lienholder must gain possessor status or secure the appointment of a receiver. In this case, the trial court found, BMO secured a judgment and thereafter issued citations to discover assets. Its efforts to collect rents, however, did *not* progress any further, such as by seeking the appointment of a receiver or seeking possession of the JCI rental properties. Thus, the trial court determined in the alternative (*i.e.*, if section 31.5 does not control) that BMO does not have a superior interest in the rents because it "did not do all that was necessary, as a junior lienholder, to supplant the right of any of the lender banks, the undisputed senior

lienholders, to the rental streams associated with the JCI properties, even on a temporary basis." Finally, the trial court found that there was no just reason to delay enforcement or appeal of its order. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). BMO appeals.

## II. ANALYSIS

BMO argues that the trial court erred in finding that Adverse Claimants hold a superior lien on the rents Briargate collects. It contends that Adverse Claimants have *no* lien on the collected funds, while BMO has the only perfected judgment lien. Adverse Claimants' mortgages and rent-assignment agreements are not relevant to this case, BMO argues, until Adverse Claimants have been granted constructive or actual possession, through the appointment of a receiver or as mortgagees in possession. For the following reasons, we find BMO's claims unavailing.

### A. Background
### 1. Citations to Discover Assets/Supplementary Proceedings

"A citation to discover assets, also known as a supplementary proceeding, is the predominant procedure for enforcing judgments. Robert G. Markoff, Jeffrey A. Albert, Steven A. Markoff & Christopher J. McGeehan, *Citations to Discover Assets*, in Creditors' Rights in Illinois § 2.42 (Ill. Inst. for Cont. Legal Educ. 2014) (citing 735 ILCS 5/2-1402(c)). That procedure, found in section 2-1402 of the Code, provides judgment creditors with a mechanism to initiate supplementary proceedings against a judgment debtor or third party in order to discover the judgment debtor's assets and apply them to satisfy the underlying judgment. *Eclipse Manufacturing Co. v. United States Compliance Co.*, 381 Ill. App. 3d 127, 133 (2007). To that end, this statute provides a circuit court with broad powers to compel parties to satisfy a judgment with discovered assets. *Stonecrafters, Inc. v. Wholesale Life Insurance Brokerage, Inc.*, 393 Ill. App. 3d 951, 958 (2009). Actions that a creditor may accomplish by another type of enforcement may be accomplished in supplemental proceedings, as a citation to discover assets has features of a creditor's bill, execution, garnishment, levy and sale. Robert G. Markoff, Jeffrey A. Albert, Steven A. Markoff & Christopher J. McGeehan, *Citation to Discover Assets*, in Creditors' Rights in Illinois § 2.42 (Ill. Inst. for Cont. Legal Educ. 2014). Additionally, supplemental proceedings are intended to be expeditious and efficient. *In re FBN Food Services, Inc.*, 158 B.R. 756, 761 (Bankr. N.D. Ill. 1993). The debtor bears the burden of demonstrating that property is exempt from being applied to satisfy a judgment. See *In re Marriage of Takata*, 383 Ill. App. 3d 782, 788 (2008)." *Wells Fargo Bank Minnesota, NA v. Envirobusiness, Inc.*, 2014 IL App (1st) 133575, ¶ 13.

During the course of supplementary proceedings, a judgment creditor may serve a citation to discover assets on a third party, requiring it to freeze assets. 735 ILCS 5/2-1402(f) (West 2014). After the citation is served, the judgment becomes a *lien* on the judgment debtor's assets. 735 ILCS 5/2-1402(m) (West 2014). At the same time, the prohibition in a third-party citation is not an injunction but, rather, serves to warn the third party of sanctions it could incur if it transfers the judgment debtor's assets. *Bank of Aspen v. Fox Cartage, Inc.*, 126 Ill. 2d 307, 314-15 (1989).

The only relevant inquiries in supplementary proceedings are (1) whether the judgment debtor possesses assets that should be applied to satisfy the judgment and (2) whether a third party is holding assets of the judgment debtor that should be applied to satisfy the judgment.

*Schak v. Blom*, 334 Ill. App. 3d 129, 133 (2002).

¶ 33            2. Assignment of Rents and the Common-Law Rents-and-Profits Doctrine

¶ 34       Generally in Illinois, "a mortgagor[/debtor], as the party in possession and owner of [a] statutory right of redemption, is entitled to any rents generated from the property as long as [the mortgagor] retains possession, without having to account for them to the mortgagee[/lender]." *Wheaton Oaks*, 27 F.3d at 1241. This can be problematic for a lender if a debtor defaults and the lender would like to access the rents from the property to apply them to the deficiencies under the note. *Id.* Thus, "Illinois allows mortgagees to include in their mortgages assignment[-]of[-]rents clauses, giving them[, preforeclosure,] a sufficient interest in the rents to authorize the appointment of a receiver through whom the mortgagee can begin collecting rents." *Id.* at 1242. But the mortgagee must obtain preforeclosure possession through the courts, by being placed in either actual or constructive possession and, again, only if so authorized by the mortgage instrument. *Id.* at 1241-42; see also *Fidelity Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 71 F.3d 1306, 1308 (7th Cir. 1995) (under Illinois common law, the rents-and-profits doctrine "forbids a mortgagee to enforce a provision of the mortgage assigning the rents or other income of the mortgaged property to [it] until the mortgagee takes possession of the property (presumably having bought in at the foreclosure sale) or a receiver is appointed to operate the property").

¶ 35       Reviewing the historical development of this concept, the *Fidelity* court noted that, as real estate financing law developed, courts decreed that, when lenders took land to ensure the repayment of loans, they did not take title to the land but "only a security interest equal to what the borrower owe[d], an interest that [shrunk], therefore, as the borrower repa[id]." *Fidelity*, 71 F.3d at 1309. A security interest does not constitute title and is not a possessory interest, and therefore, "it does not entitle the lender to receive the rent or other income that the property throws off." *Id.* An assignment of rents to the lender is "inconsistent with the character of the lender's interest in the property generating the rents, as it would give the lender a right associated with ownership." *Id.* This is the view in "lien-theory" states such as Illinois.[4] *Id.*; see also *Monarch*, 153 B.R. at 833 (assignment of rents is different from other security interests; typically, "a perfected lien gives the creditor an interest in a specific piece of property, whereas an assignment of rents allows the mortgagee to collect rents that come due after the mortgagee takes control of the property").

¶ 36       The public policies underlying this framework ensure that mortgagees' interests are protected, while also ensuring proper maintenance of the properties at issue. *Wheaton Oaks*, 27 F.3d at 1242 (assignment-of-rents provisions allow creditors to reach the rents *prior* to completion of foreclosure proceedings and prevent a mortgagor from collecting rents after default and not making payments under the mortgage agreement); *Comerica*, 284 Ill. App. 3d at 1034 (but the possession requirement—actual, or constructive with court authorization—reflects a policy that seeks to prevent mortgagees from stripping the rents from the property and leaving the mortgagor and tenants without resources for maintenance or

---

[4]In "title-theory" states, which retain some of the early English legal concept of a mortgage as a conveyance, "the rents of a mortgaged property are considered an important part of the mortgagee's security." *Id.*

- 8 -

repair).

The *Comerica* court was the first to hold that constructive possession to enforce an assignment-of-rents provision must include court authorization. *Comerica*, 284 Ill. App. 3d at 1034-35; see also Robert C. Feldmeier, *Enforcing Assignment-of-Rents Provisions in Illinois*, 86 Ill. B.J. 436, 438 (1998). The case does not address section 31.5 of the Conveyances Act.

In *Comerica*, upon which BMO primarily relies, two lenders, Comerica and a trustee, sought an award of rents after the borrower defaulted on its mortgages by failing to pay real estate taxes. After the borrower defaulted, Comerica exercised its rights under its assignment of rents and began collecting rents for the property without foreclosing on the first mortgage, seeking the appointment of a receiver, or obtaining court authorization. (This option apparently permitted it to reduce the debt without assuming responsibility for the property or the tax burden.) Comerica then filed a complaint, seeking an accounting and other relief against the borrower and the mortgage guarantors. Separately, the trustee filed an action to foreclose on the second mortgage, seeking an accounting, the appointment of a receiver, and a return of the rents from Comerica. The trial court found that the rents belonged to the possessor of the property and awarded them to the borrower. It also granted the trustee's request for an accounting. (Subsequently, the borrower settled with Comerica, assigning its interest in the rents to Comerica in the event that the appellate court ruled in the borrower's favor. The appellate court, thus, found Comerica's appeal moot and addressed only the trustee's appeal. *Comerica*, 284 Ill. App. 3d at 1033.)

On appeal, the *Comerica* court reviewed the history of and policy behind assignments of rents, noting that, at common law, a mortgagee/lender had to take actual possession before it was entitled to rents. *Id.* This rule reflected a public policy seeking "to prevent mortgagees from stripping the rents from the property and leaving the mortgagor[/debtor] and the tenants without resources for maintenance or repair." *Id.* The *Comerica* court quoted a bankruptcy case:

> " 'To obtain the benefits of possession in the form of rents, the mortgagee must also accept the burdens associated with possession—the responsibilities and potential liability that follow whenever a mortgage goes into default. The mortgagee's right to rents, then, is not automatic but arises only when the mortgagee has affirmatively sought possession with its attendant benefits and burdens.' " *Id.* at 1033-34 (quoting *Monarch*, 153 B.R. at 833).

The *Comerica* court also acknowledged a "modern trend" that permitted a mortgagee to collect rents once it had taken *constructive*, as opposed to *actual*, possession, such as by a judicial award of injunctive relief or appointment of a receiver. *Id.* at 1034 (citing cases). Thus, a mortgagee must take some *affirmative action* to gain possession of the property. *Id.* The *Comerica* court held that neither Comerica nor the trustee was entitled to the rents because neither had taken actual or constructive possession of the property. *Id.* As to Comerica, the court noted that "a mortgagee still needs to obtain a *court's authorization* before [it] may collect rents without taking possession." (Emphasis added.) *Id.* This ensures that all parties' interests are before the court. *Id.* The *Comerica* court refused to recognize the assignment-of-rents provision in Comerica's agreement. *Id.* As to the trustee, the *Comerica* court held that the trustee's filing of certain pleadings, such as the foreclosure action or the

request for the appointment of a receiver, was not sufficient to trigger the mortgagee's right to collect rents, where the trustee did not obtain prejudgment possession of the property and where the rents were collected while the mortgagor was in possession and before the receiver was appointed. *Id.* Rather, the court concluded, it is a "trial court's affirmative ruling on such filings that entitles the mortgagee to the rents." *Id.* at 1035. In a foreclosure action, a mortgagee is not entitled to rents until a judgment has been entered, unless the mortgage agreement permits the mortgagee to obtain prejudgment possession. *Id.* at 1034-35. Similarly, a request for the appointment of a receiver is not sufficient; rather, a receiver must be appointed on the mortgagee's behalf and take actual possession of the property. *Id.* at 1035. Accordingly, the *Comerica* court affirmed the trial court's ruling that the rents collected belonged to the mortgagor. *Id.*

¶ 42    In sum, *Comerica* held that (1) assignment-of-rents provisions are enforceable only when lenders take actual or constructive possession of the mortgaged property and (2) constructive possession requires affirmative action that must include court authorization (such as the appointment of a receiver) to collect the rents. *Id.* at 1034-35; see also *In re Callas*, No. 13 B 43900, 2015 WL 1850260, at *7 (Bankr. N.D. Ill. Apr. 23, 2015) (reviewing case law and noting that, "under Illinois law, a security interest in rents arising under an assignment of rents, while perfected against third parties upon recordation, does not grant an interest in particular amounts, paid after default and constituting rents from the property, until affirmative steps are taken by the mortgagee to acquire possession of the property through either foreclosure or the appointment of a receiver pending foreclosure"); *cf. Fidelity*, 71 F.3d at 1309-10 (rents-and-profits doctrine does *not* apply to agreements involving the recovery of postdefault rent that are *not* assignment-of-rents agreements; specifically, an indemnity agreement, under which a borrower agreed to turn over postdefault rents to the lender upon receipt, was not an assignment-of-rents agreement because it did not involve an outright assignment of the rents to the lender and only required the borrower to pay over rents it collected upon receipt; it was in the nature of a guarantee).

¶ 43                    4. Perfection and Enforcement

¶ 44    The common law distinguishes between perfection and enforcement of assignment-of-rents interests. An assignment of rents creates a security interest/lien in the rental income. *Monarch*, 153 B.R. at 833. That security interest is *perfected* upon recordation. *Id.*; see also *West Bend*, 712 F.3d at 1034-35; *Callas*, 2015 WL 1850260, at *7.

¶ 45    Taking possession constitutes *enforcement* of the lien (*i.e.*, when a party takes affirmative steps to start collecting the rents, it is enforcing its lien). The lien is not one on specific rents held by the mortgagor; rather, "an assignment[-]of[-]rents provision allows the mortgagee *to take certain steps [i.e., enforce]*, after default *** to obtain possession of the property and start collecting the rents; but until [it] takes such steps the mortgagor is entitled to keep the rents." (Emphasis added.) *Wheaton Oaks*, 27 F.3d at 1242; see *Monarch*, 153 B.R. at 833 ("[t]he requirement that a mortgagee *enforce* its lien on rents by possession of the real estate renders an assignment of rents different from security interests in other property" (emphasis added)); see also *Callas*, 2015 WL 1850260, at *7 ("a security interest in rents arising under an assignment of rents, while *perfected* against third parties upon recordation, does not grant an interest in particular amounts, paid after default and constituting rents from the property, until affirmative steps are taken by the mortgagee to acquire possession of the property [(*i.e.*,

- 10 -

*enforce* the lien)] through either foreclosure or the appointment of a receiver pending foreclosure"); *id.* (an assignment of rents creates a lien upon the rents of the property "that may be *enforced* upon default by taking affirmative steps to acquire possession of the land by the mortgagee or a receiver appointed on the mortgagee's behalf" (emphasis added)); 27A Ill. L. and Prac. *Mortgages* § 80 (2016).

¶ 46     There is some authority for the proposition that a lockbox arrangement or other direct-payment system constitutes sufficient enforcement of an assignment of rents; thus, under this view, court authorization is not the only enforcement mechanism. *West Bend*, 712 F.3d at 1035 (reviewing Illinois case law). In *West Bend*, a creditor sought to enforce a judgment against a bank where the judgment debtor had an account and had borrowed on the security of some commercial real estate. However, the bank "did not enforce a direct-payment system or appoint a receiver to collect the rents on its behalf," and some funds flowed to the judgment debtor. *Id.* at 1034. The court first noted that the bank's interest was senior to the creditor's interest because an assignment is perfected when it is recorded. *Id.* at 1034-35. However, it continued, when rents are paid directly to the debtor, the security interest evaporates. *Id.* at 1035. To *enforce* the assignment, "a creditor must arrange for the tenants to pay it directly through a lockbox, or for a third party such as a receiver to take possession for the lender's benefit." *Id.* (citing *Comerica*, 284 Ill. App. 3d at 1035). In that case, the funds flowed to the debtor's account (*i.e.*, not to the bank, through a direct-payment system), whereupon the bank's security interest evaporated. *Id.*

¶ 47     We further note that, in 1995, the *Fidelity* court contemplated this possibility and noted that it was unclear if the rents-and-profits doctrine forbids "enforcing the mortgagor's agreeing to place a portion of the rents in escrow (the type of 'lockbox' arrangement that is common in commercial lending secured by personal rather than real property) to be available to the mortgagee in the event of a default, an issue on which we cannot find any cases." *Fidelity*, 71 F.3d at 1309-10. Of course, in 2013, the *West Bend* court read Illinois law to permit this option.

¶ 48                              5. Section 31.5 of the Conveyances Act

¶ 49     Section 31.5 of the Conveyances Act became effective on January 1, 1996. Pub. Act 89-39, § 5 (eff. Jan. 1, 1996) (adding 765 ILCS 5/31.5). The provision states, in relevant part:

> "(b) If an instrument assigning the interest of the assignor in rents arising from the real property described in the instrument is recorded, pursuant to this Act, in the county in which the real property is situated, then the interest of the assignee in those rents is *perfected* upon that recordation without the assignee taking any other affirmative action.
>
> The recordation is constructive notice to subsequent purchasers, creditors, and third parties of the content and effect of the assignment with the same force and effect as any other duly recorded instrument or conveyance of an interest in real property under Sections 30 and 31 of this Act. From the time of the recordation, *the assignee has a superior claim to the rents* that are subjected to the assignment, as against all parties whose claims or interests arise or are perfected thereafter.
>
> (c) This Section applies whether the assignment is absolute, conditional, or intended as security.

(d) *Unless otherwise agreed to by the parties*, the *mere recordation* of an assignment does not affect who is entitled, as between the assignor and the assignee, to collect or receive rents until the assignee *enforces* the assignment under applicable law.

(e) The fact that the assignee may permit the assignor to collect rents under the terms of an assignment does not affect the validity, enforceability, or priority of an assignment perfected in the manner set forth in subsection (b)." (Emphases added.) 765 ILCS 5/31.5(b), (c), (d), (e) (West 2014).

¶ 50    Although section 31.5 became effective just prior to the *Comerica* decision, the *Comerica* court did not address the statute. Thus, the statute's impact on *Comerica* is an open question. Robert C. Feldmeier, *Enforcing Assignment-of-Rents Provisions in Illinois*, 86 Ill. B.J. 436, 439 (1998).

¶ 51                                          B. Issues
¶ 52                              1. Effect of Section 31.5 on *Comerica*
¶ 53    Turning to BMO's first argument, BMO argues that *Comerica* is binding and was not superseded by section 31.5. Adverse Claimants and the trial court, according to BMO, mistake *perfection* for *enforcement*, and the trial court's interpretation (1) is inconsistent with, and renders meaningless, legislative enactments concerning a creditor's ability to collect rents and (2) is in derogation of common law and violates public policy. BMO maintains that this case is not a priority dispute between secured parties but, rather, a dispute between a party with a perfected citation lien (BMO) and other parties (Adverse Claimants) who are unsecured due to their failure to obtain court authorization to collect the rents for the JCI properties. It argues that because Adverse Claimants did not have possession of the properties and did not obtain court authorization to collect the rents, their arrangements are void as against public policy under the rents-and-profits doctrine. BMO maintains that it is arguing not that it is entitled to collect the rents but that, once they were collected, (1) they simply became funds held by Briargate, (2) Adverse Claimants had no lien on the funds because, once the rents were collected, Adverse Claimants' liens evaporated, and (3) BMO maintained its perfected citation lien on the funds. For the following reasons, we reject BMO's argument and hold that the Briargate citation cannot reach the assigned rents. Through the forbearance agreements, which predated the Briargate citation, Adverse Claimants enforced the recorded/perfected assignment-of-rents provisions in their mortgages and, thus, the rents were no longer in JCI's, the debtor's, possession or control.

¶ 54    We review *de novo* issues of statutory construction. *Wells Fargo Bank, N.A. v. McCluskey*, 2013 IL 115469, ¶ 10. The primary rule of statutory construction requires that we give effect to the legislature's intent. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16 (1996). In ascertaining the legislature's intent, we begin by examining the plain language of the statute, reading the statute as a whole, and construing it so that no word or phrase is rendered meaningless or superfluous. *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). "Where the language is clear and unambiguous, the statute must be given effect as written without resort to further aids of statutory construction." *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008).

¶ 55    The trial court found that, under section 31.5, Adverse Claimants hold a superior lien on the Briargate funds. The forbearance agreements, the court further found, are enforceable, are like the lockbox or other direct-payment arrangements specified in the case law, and are beyond the reach of any third-party claims that are perfected or arise thereafter.

¶ 56    We conclude that section 31.5 unambiguously provides that an assignment of rents is *perfected* upon recording and provides that the assignee has a superior claim to the rents "as against all parties whose claims or interests arise or are perfected thereafter." 765 ILCS 5/31.5(b) (West 2014). The statute further provides, unambiguously, that, as between assignor (such as JCI/Briargate) and assignee (Adverse Claimants), the mere recording does not affect who is entitled to the rents until the assignee (Adverse Claimants) *enforces* the assignment "under applicable law," *unless, as is critical here, the parties agree otherwise*. 765 ILCS 5/31.5(d) (West 2014).

¶ 57    BMO contends that this reading of section 31.5 puts the statute in direct contrast with other statutes and renders them meaningless. BMO argues that section 31.5 is not ambiguous and that subsection (d) clearly incorporates enforcement through applicable law, which, in BMO's view, reflects the legislature's intent that the statute controls *perfection*, not *enforcement*. Next, BMO contends that, even if the legislature "disposed" of the rents-and-profits doctrine in section 31.5, the statute still requires that an agreement to collect rents be reflected in the recorded document that gives rise to the lien. Here, it notes, the trial court never found that any recorded document provided Adverse Claimants the right to collect rents. Instead, the court relied upon unsigned agreements that were not recorded, in violation of the statute. BMO further argues that the trial court's reading departs from *Comerica* and other case law. BMO's second point is that, if Adverse Claimants are allowed to collect rents without court authority, this would violate common law, which applies because the statute does not state that rents can be collected without such authority.

¶ 58    We disagree with BMO that section 31.5 controls only *perfection* of an assignment of rents. The statute explicitly provides in subsection (d) that rent entitlement is determined once an assignment is *enforced*, unless otherwise agreed to by the parties. *Id.* We also disagree with BMO's assertion that, even if parties may agree otherwise, there were no signed and recorded documents here that enforced Adverse Claimants' assignments. It is undisputed that the assignment-of-rents provisions upon which Adverse Claimants rely are contained in recorded mortgage instruments (indeed, they were recorded prior to either the Briargate or the JCI citation and even prior to BMO's judgment). Adverse Claimants *perfected* these liens when they recorded the instruments. 765 ILCS 5/31.5(b) (West 2014). The assignments were properly *enforced* when, by electing to agree "otherwise" and enforce them other than under applicable law, the parties, prior to the Briargate citation, entered into the forbearance agreements to transmit the rents Briargate collected directly to Adverse Claimants (after payment of the properties' expenses). 765 ILCS 5/31.5(d) (West 2014). There is no dispute that Adverse Claimants entered into these agreements, and there is no statutory requirement that the forbearance agreements be recorded. Thus, Adverse Claimants properly *enforced* their assignments.

¶ 59    As to *Comerica*, the court in that case did not address section 31.5 and its language in subsection (d), allowing parties to contract to enforce an assignment other than pursuant to applicable law. *Comerica* might remain viable in cases where the parties have not agreed to "otherwise" enforce assignments of rents. But that is not the case here. *West Bend* recognized a mechanism—a lockbox arrangement or other direct-payment system—by which parties can enforce assignments of rents other than through court authorization. *West Bend*, 712 F.3d at 1035. Here, JCI contracted away in the forbearance agreements its right to receive the rents, which, after deduction of property expenses, Briargate directly forwarded to Adverse

Claimants.[5] As JCI and Briargate note, at no point did BMO take the required steps—seeking a turnover of the rents or the appointment of a receiver—to supplant Adverse Claimants' priority positions. BMO, in their view, has an unenforced citation lien that cannot trump an assignment of rents. We agree.

¶ 60 Furthermore, as Rockford and Byron note, the supplementary-proceedings statute provides that citations can reach only those assets in the possession or control of the judgment debtor (or belonging to the judgment debtor but in the possession or control of the third-party citation respondent).[6] 735 ILCS 5/2-1402(a) (West 2014); see also 735 ILCS 5/2-1402(m) (West 2014) (lien established by service of citation does not affect the citation respondents' rights in property *prior* to the service of the citation upon them, and the lien created does not affect the rights of *bona fide* purchasers or lenders *without notice* of the citation). Thus, given Adverse Claimants' control over the rents pursuant to the forbearance agreements between themselves, JCI, and Briargate, no citation lien can attach to the rents collected by Briargate.

¶ 61 BMO next points to several sections of the Illinois Mortgage Foreclosure Law (Foreclosure Law). 735 ILCS 5/15-1701, 15-1703, 15-1704, 15-1706 (West 2014) (addressing the right to possession during foreclosure).[7] It reads these provisions as establishing requirements before a lender can collect rents to the exclusion of other parties who may claim an interest. BMO argues that the trial court's ruling usurps the legislature's statutory protections and disregards its statutory predicates. It suggests that if the law is as the trial court interpreted it, then no creditor would ever go to court to enforce its right to collect rents. The legislature's detailed mortgagee-in-possession and receivership rules, BMO urges, should not be interpreted in a manner that renders them superfluous.

¶ 62 We reject BMO's argument. Section 31.5(d) of the Conveyances Act, the more specific statute, applies here. Adverse Claimants did not file foreclosure actions. Rather, they entered into agreements to enforce assignments of rents. Section 31.5(d), not the foreclosure statute, specifically addresses that scenario.

¶ 63 BMO next argues in the alternative that, if the statute is ambiguous, the legislative history nevertheless reflects that the General Assembly was merely *clarifying* the law concerning how an assignment of rents is perfected, such as where a junior lender is allowed to continue to collect rents after a senior lienholder attempted to enforce it.

---

[5]Rockford notes that, under its forbearance agreement, rent payments received by check and money order were signed over to Rockford to be deposited into a bank-controlled account. Only credit card payments were deposited by Briargate and then remitted to Rockford. After deduction of escrow payments and loan payments, any remaining funds were released back to Briargate for payment of expenses for the property. No funds collected by Briargate were to be paid to JCI. The Byron agreement similarly provided that rents collected by Briargate, minus expenses and management fees, would be turned over to Byron with a rent roll report.

[6]At oral argument, BMO conceded that, if the funds Briargate collected were not JCI's property, its argument failed.

[7]The procedures for obtaining possession are contained in the article of the Foreclosure Law addressing possession during foreclosure. 735 ILCS 5/15-1701 *et seq.* (West 2014); *Monarch*, 153 B.R. at 832-33 & n.3; see 735 ILCS 5/15-1706(a) (West 2014) (request that a mortgagee be placed in possession or that a receiver be appointed must be made by motion); 735 ILCS 5/15-1703(a)(1) (West 2014) (a mortgagee in possession has the right to receive rents); 735 ILCS 5/1704(b)(2) (West 2014) (a receiver appointed for the mortgaged property has the power and authority to collect rents).

- 14 -

¶ 64        Again, section 31.5 is not ambiguous. But even assuming, *arguendo*, that it is, our holding remains the same. We disagree with BMO that the legislative history reflects that section 31.5 merely clarifies the law on perfection. We find the legislative history unhelpful because it focuses on perfection of assignments-of-rent interests, not enforcement, and the statute distinguishes between the two concepts. The legislative history of section 31.5 reflects that the General Assembly intended the statute to "provide procedures for perfecting an assignment of rents by recordation" and that such an assignment "will be perfected from the time it is recorded and without requiring the assignee to take any other action." 89th Ill. Gen. Assem., House Proceedings, May 8, 1995, at 180 (statements of Representative Biggert). The House sponsor noted that there was no statute that set forth how to perfect a security interest in rents, that "court decisions have been highly inconsistent," and that *most*, but not all, courts have held that recording is sufficient. *Id.* at 180-81 (further noting that *some* cases had held that the second mortgagee had top priority). "So, this really is a clarification of the law." *Id.* at 181. In the Senate, the sponsor also noted that there was no statute on the matter and that the enactment would "simply codify common[-]law rules." 89th Ill. Gen. Assem., Senate Proceedings, Mar. 24, 1995, at 31 (statements of Senator Fitzgerald).

¶ 65        Assuming, *arguendo*, that section 31.5 is ambiguous, we find that public policy considerations weigh in favor of our reading. As noted, the public policies underlying the rents-and-profits doctrine ensure that mortgagees' interests are protected, while also ensuring proper maintenance of the properties at issue. *Wheaton Oaks*, 27 F.3d at 1242 (assignment-of-rents provisions allow creditors to reach the rents *prior* to completion of foreclosure proceedings and prevent a mortgagor from collecting rents after default and not making payments under the mortgage agreement); *Comerica*, 284 Ill. App. 3d at 1034 (but the possession requirement—actual, or constructive with court authorization—reflects a policy that seeks to prevent mortgagees from stripping the rents from the property and leaving the mortgagor and tenants without resources for maintenance or repair). The forbearance agreements here allow for the expenses of maintenance, management, and repair of the properties to be paid from the rents. Thus, the public policy to be advanced by requiring a mortgagee to take actual or constructive possession of the property through court action, as addressed in *Comerica*, is not implicated because the agreements require Adverse Claimants to accept both the benefits and the maintenance and repair burdens of the properties. In this way, the tenants' needs were met by Briargate's active management of the properties, and Adverse Claimants received the net rents. Indeed, if the forbearance agreements had not accounted for management expenses, as further specified in the leases, it is arguable that they would have been void as against public policy.

¶ 66                                    2. Commingling

¶ 67        Next, BMO argues that, assuming, *arguendo*, that a secured lender may collect rents without court authorization, Adverse Claimants still do not have a lien on the Briargate funds because any such lien *evaporated* when Briargate (as mortgagor JCI's agent) collected the funds and deposited them into its bank account, thereby commingling them with its assets. *West Bend*, 712 F.3d at 1035 ("when rentals are paid directly to the debtor, the security interest evaporates"). BMO argues that there was no evidence that Briargate acted as Adverse Claimants' agent, as opposed to JCI's agent. BMO points to the January 1, 2014, JCI-Briargate

management agreement, noting that it states, in section 5(b), that all funds collected by Briargate will remain JCI's property.[8]

¶ 68    JCI and Briargate respond that the rents were not JCI's cash assets commingled with Briargate's operating account because, pursuant to the assignment of rents, Briargate managed the properties for *Adverse Claimants, not JCI*. They point to a different portion of the JCI-Briargate management agreement, section 9(j), which allows for the assignment of the agreement to the *lender* and which they argue was *exercised* via the actual assignment of the rents.[9] Thus, they reason, Briargate became Adverse Claimants' agent.

¶ 69    We find BMO's argument unavailing and disagree that no agreement such as that contemplated in section 9(j) of the management agreement is in the record or was alleged by Adverse Claimants. The forbearance agreements, which are in the record, effectuated the enforcement of Adverse Claimants' liens. We also disagree with BMO's additional assertion that there were factual issues that the trial court should have resolved. BMO points to Contarino's deposition testimony that Briargate started paying Adverse Claimants directly in order to avoid the JCI citation. Whether or not the forbearance agreements were entered into to protect JCI's interests, the contracts speak for themselves and unambiguously reflect that JCI contracted away its right to receive the rents. The parties' intent beyond that is not relevant to interpreting the unambiguous agreements.

¶ 70    Further, as Rockford and Byron note, *West Bend* is distinguishable because there the funds used by the judgment debtor to pay the bank were rent payments collected by the debtor and deposited into his bank account after service of the citation upon him. Here, Briargate, a third party, collects the rents and they are *not* paid over to or into JCI's account. The *West Bend* court acknowledged such an option as an enforceable means of continuing the interest in the rents. *Id.* at 1034-35 ("a creditor must arrange for the tenants to pay it directly through a lockbox, or for a third party such as a receiver to take possession for the lender's benefit").

¶ 71    We agree with Midwest that BMO's reasoning would lead to the ridiculous result that a lender would have a lien on unpaid rents but would lose the lien once it turns into cash. Further, section 31.5(e) of the Conveyances Act specifically provides that the priority of a perfected assignment is unaffected by whether an assignee permits an assignor to collect rents under the terms of an assignment. 765 ILCS 5/31.5(e) (West 2014).

¶ 72                                    3. Prove-up

¶ 73    Next, BMO argues that, even if the trial court did not err in finding that Adverse Claimants' lien was superior to BMO's, the trial court erred in failing to require that Adverse Claimants

---

[8]Section 5(b) of that agreement addresses the operating account into which Briargate is to deposit all funds it collects, noting that the account shall be segregated and be in the "Manager's name as custodian for Owner" and that "[a]ll funds deposited into the Operating Account shall be and remain Owner's property."

[9]Section 9(j) of the agreement addresses lender agreements and provides, in relevant part:

   "Manager shall sign and deliver such agreements related to the subject matter hereof as any of Owner's lenders may reasonably require, including, without limit thereto, *** [1] lender's right to terminate this Agreement in the event Owner is in material default of an obligation owed lender, *** and [2] assignment of this Agreement to the lender and agreement to perform services for the lender (any such agreement being a '*Lender Agreement*') ***." (Emphasis in original.)

prove up the existence or amount of the indebtedness and corresponding liens. BMO focuses on the fact that, prior to the trial court's ruling, Rockford, which apparently claims more than 75% of the funds here, entered into a consent foreclosure in which it accepted title to the properties in exchange for satisfaction of the indebtedness owed to it by, as relevant here, JCI. BMO argues that Rockford was awarded double satisfaction of its claims because Rockford no longer was owed any debts at the time of the trial court's ruling.

¶ 74       The trial court rejected the prove-up issue, noting that the existence of the forbearance agreements was not disputed and that BMO had cited no authority in support of its argument, which it asserted for the first time in its motion to clarify and reconsider. As to Rockford's consent foreclosure, the court also noted that case law instructed that "[a]n express pledge of rents is *not* extinguished by a foreclosure sale which merges the title and the debt in the same party." (Emphasis added.) *Randall Plaza*, 326 B.R. at 141.

¶ 75       We find BMO's argument unavailing. BMO argues that *Randall Plaza* is distinguishable because it merely permitted a creditor that had taken title to the property to collect outstanding rents from the tenants and stated that the foreclosure did not affect that creditor's ability to collect *future and outstanding* rents as the property owner. We disagree with BMO's reading, as the court's holding encompassed rents from the time of default to any time thereafter. *Id.* The *Randall Plaza* court held that the creditor had a valid assignment of rents and had taken appropriate steps to enforce it prior to foreclosure. *Id.* at 140. The creditor both initiated foreclosure proceedings and obtained the appointment of a receiver, thus commencing proceedings under which it could gain possession of the property for purposes of collecting rent. *Id.* at 141. The court noted that the assigned rents included "all rents that were unpaid at the time [the creditor] gave notice of the default" or any time thereafter. *Id.* Critically, the court also held that the creditor's purchase of the property after foreclosure did *not* extinguish *both* the mortgage *and* the lien on the rents but extinguished only the mortgage. *Id.* The rents were unaffected because "[a]n express pledge of rents is not extinguished by a foreclosure sale which merges the title and the debt in the same property." *Id.* (citing cases). Pursuant to *Randall Plaza*, the consent foreclosure judgment did not act to waive Rockford's lien on the rents.

¶ 76       Furthermore, the prove-up issue is unavailing because, as Adverse Claimants note, the facts asserted in their adverse claims are undisputed and, at all stages of these proceedings, they asserted their contractual and lien rights to the funds and consistently maintained that the funds, which Briargate collected as JCI's management agent, were no longer JCI's property; rather, by agreement (the forbearance agreements), which the trial court correctly found to be enforceable, they had become Adverse Claimants' property.

¶ 77       We note that BMO never asked for a hearing below to address any factual issues, nor did it request additional discovery. Further, it framed the prove-up issue as a question of law, namely, whether the consent foreclosure judgment waived Rockford's lien on the rents. Specifically, in its motion to clarify and reconsider, BMO argued that Adverse Claimants "must first prove up their claims against JCI, as a matter of law." Given our holding that the consent foreclosure judgment did not waive Rockford's lien, there is no factual question to be resolved.

¶ 78                                III. CONCLUSION

¶ 79            For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 80            Affirmed.