# Illinois Official Reports

## Appellate Court

---

**_U.S. Bank National Ass'n v. Randhurst Crossing LLC_, 2018 IL App (1st) 170348**

---

| | |
|---|---|
| Appellate Court Caption | U.S. BANK NATIONAL ASSOCIATION, as Trustee, Successor-in-Interest to Bank of America, N.A., as Trustee Successor to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2003-C5, By and Through Its Special Servicer, CWCapital Asset Management, LLC, Plaintiff-Appellee, v. RANDHURST CROSSING LLC; and UNKNOWN OWNERS AND NONRECORD CLAIMANTS, Defendants (Randhurst Crossing LLC, Defendant-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-0348 |
| Filed | March 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CH-14977; the Hon. Anna M. Loftus, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Adam C. Toosley, of Freeborn & Peters LLP, of Chicago, for appellant.<br><br>Kori M. Bazanos, of Bazanos Law P.C., of Chicago, and Gregory A. Cross and Brent W. Procida, of Venable LLP, of Baltimore, Maryland, for appellee. |

JUSTICE GORDON delivered the judgment of the court, with opinion.

Presiding Justice Burke and Justice McBride concurred in the judgment and opinion.


**OPINION**

¶ 1 The instant appeal arises from the foreclosure of defendant Randhurst Crossing LLC's mortgage on commercial property. During the course of the foreclosure proceedings, prior to the appointment of a receiver, defendant filed for Chapter 11 bankruptcy in federal court, which stayed the foreclosure proceedings. After the automatic stay was lifted in the bankruptcy action, a receiver was appointed in the foreclosure proceedings, and the trial court ordered all rents paid during the bankruptcy to be turned over to the receiver. The trial court ultimately granted summary judgment in plaintiff's favor concerning the foreclosure action. In the judgment of foreclosure and sale, the trial court also awarded plaintiff its attorney fees, as provided in the loan documents. On appeal, defendant challenges (1) the order requiring turnover of the prereceivership rents, (2) the trial court's award of attorney fees, and (3) the trial court's denial of defendant's request that the property manager that managed the property during the bankruptcy proceedings be paid. For the reasons that follow, we affirm the trial court's judgment.

¶ 2                                      BACKGROUND

¶ 3 The parties have engaged in years of extensive litigation, in both state court and in bankruptcy court. The instant appeal concerns three narrow issues: whether the trial court properly awarded plaintiff prereceivership rents, whether the trial court properly awarded plaintiff its attorney fees, and whether the trial court properly denied defendant's request that the property manager be paid. We focus on the facts relevant to those issues and provide other facts only as required for context.

¶ 4                             I. Prebankruptcy Proceedings

¶ 5 In defendant's own words, defendant "is a single-asset real estate entity that was engaged in the business of owning and operating a retail shopping center located at the northwest corner of Rand Road, Route 83, and Kensington Road, in Mt. Prospect, Illinois" (the property). Defendant was the obligor on a note executed on October 31, 2002, in the amount of $3.9 million, which was secured by a mortgage on the property; the maturity date on the note was November 11, 2012. The plaintiff trust is the successor in interest to the note and mortgage, and the current lawsuit is being pursued by its servicer on its behalf; we refer to the trust and the servicer interchangeably as "plaintiff."

¶ 6 On the same day as the execution of the mortgage and note, defendant also executed an "Assignment of Leases and Rents," which provided, in relevant part, that defendant

"is hereby permitted, and is hereby granted a revocable license by Assignee, to retain possession of the Leases and to collect and retain the Rents unless and until there shall be an Event of Default under this Assignment, the Mortgage or the other Loan

Documents. In the event of such Event of Default, the aforementioned license granted to Assignor shall automatically terminate without notice to Assignor, and Assignee may thereafter, without taking possession of the Property, take possession of the Leases and collect the Rents."

This assignment of leases and rents was recorded on November 4, 2002.

¶ 7 On December 18, 2012, plaintiff sent a letter to defendant, informing defendant that an event of default had occurred due to defendant's failure to pay the outstanding indebtedness due on November 11, 2012, the maturity date, and making a demand for the payment of all unpaid amounts due and owing. On the same day, plaintiff sent a letter to defendant providing that, upon execution of the agreement by both parties and the payment of a forbearance fee of $20,000, the letter would constitute a forbearance agreement by which plaintiff would forbear exercising its rights and remedies against defendant and the property from November 11, 2012, through March 18, 2013. This letter was executed by both parties, with defendant executing it on January 23, 2013, and there is no dispute that defendant paid the $20,000 forbearance fee.

¶ 8 On April 12, 2013, plaintiff sent a letter to defendant, indicating that plaintiff would agree to extend the forbearance period to June 16, 2013, upon execution by both parties of the letter and upon tender by defendant of an additional forbearance fee of $30,000. This letter purports to have been executed by defendant on March 14, 2013;[1] the copy of the letter contained in the record on appeal does not contain plaintiff's signature.[2]

¶ 9 On June 18, 2013, plaintiff filed a complaint for foreclosure against defendant, alleging that defendant was in default and, in addition to a judgment of foreclosure and sale, requested the appointment of a receiver.

¶ 10 On June 20, 2013, plaintiff filed a separate motion for appointment of a receiver, as authorized by the mortgage. The motion claimed that upon its appointment, the receiver would

---

[1]The date on the letter, as noted, is April 12, 2013, but the signature of Stephen Ballis, defendant's manager, contains a handwritten date of March 18. Presumably, the letter was executed after the date of its sending. However, it is not clear which date—the date of the letter or the date of the signature—is erroneous.

[2]The validity of this second forbearance agreement was a point of contention between the parties throughout the litigation. Plaintiff initially appears to have conceded the validity of this agreement—this letter, which constitutes the second forbearance agreement, was attached to plaintiff's motion for summary judgment, which also included the affidavit of Gregory Akins, a senior vice president with plaintiff servicer. In this affidavit, Akins averred that this letter constituted "[a] true and correct copy of the second forbearance agreement between the Trust and Randhurst which, among other things, extended the Maturity Date to June 16, 2013 for the payment of a fee." Akins further averred that "[a]fter entering into two forbearance agreements that, among other things, extended the Maturity Date to June 16, 2013 (the 'Forbearance Period')[,] Randhurst remained in default under the Note and Mortgage by failing to pay the full amount of principal and interest owing after the Forbearance Period lapsed." However, at some point after the motion for summary judgment was filed, plaintiff apparently changed its position concerning the validity of the second forbearance agreement, despite Akins's sworn statement that the parties "enter[ed] into" two forbearance agreements. During the hearing on plaintiff's amended motion for summary judgment, plaintiff's counsel argued that this statement by Akins in his affidavit was a "mistake." Nevertheless, the validity of the second forbearance agreement does not change the analysis of the issues present on appeal and, in fact, plaintiff did not file its foreclosure suit until after the expiration of the second forbearance period.

also provide property management services. On September 23, 2013, the motion was entered and continued to November 14, 2013.

¶ 11    On March 17, 2014, the day that the motion for appointment of receiver was to be heard, the trial court entered an order staying the case due to defendant's March 14, 2014, filing of Chapter 11 bankruptcy.

¶ 12                                    II. Bankruptcy Proceedings

¶ 13    As relevant to the instant appeal, on May 14, 2014, plaintiff filed a motion in bankruptcy court, in which plaintiff requested that the rents collected from the property's tenants be considered "cash collateral" pursuant to the Bankruptcy Code (11 U.S.C. § 363(a) (2012)) and that defendant be prohibited from using such cash collateral. The motion claimed that plaintiff had sent defendant a letter stating that the rents were considered cash collateral under the Bankruptcy Code and "the Debtor did not have permission to use cash collateral." However, the motion claimed that "[t]he Debtor's first Small Business Monthly Operating Report *** raises significant questions about whether the Debtor is engaging in the unauthorized use of Cash Collateral and properly segregating and accounting for these funds." Accordingly, plaintiff sought a court order "prohibiting the Debtor from further use of [plaintiff's] Cash Collateral and compelling the Debtor to account for and segregate all Cash Collateral, together with such other relief as may be just and proper."

¶ 14    On May 20, 2014, the bankruptcy court entered an order that "[u]pon the Motion of [plaintiff] to Prohibit Use of Cash Collateral and Compel Segregation and Accounting; the Court being duly advised in the Premises; it is hereby: ORDERED, the Debtor is prohibited from using any proceeds of the real property *** without permission from the Trust or Court authorization" and further ordering defendant to segregate all proceeds of the property. We refer to this as the "cash collateral order."[3]

¶ 15    On July 15, 2014, the bankruptcy court held a hearing on a "Motion to Hold the Debtor in Contempt" filed by plaintiff due to defendant's lack of compliance with the cash collateral order, and on March 30, 2015, the bankruptcy court entered an order holding defendant in contempt. The transcript of the hearing and the order reflect that defendant had made postpetition payments from a bank account containing rents collected from tenants without first seeking the bankruptcy court's permission, and the order required defendant to return the payments to the account.

¶ 16    On April 28, 2015, the bankruptcy court continued defendant's motion to dismiss the bankruptcy action[4] but indicated that it would be inclined to lift the automatic stay, noting:

---

[3]We note that, during oral argument in the instant appeal, defendant's counsel suggested that this order was a standard order that had been prepared by defendant and "was brought on a motion by the debtor." However, as noted, the order itself makes clear that it was entered "[u]pon the Motion of [plaintiff]" and the order indicates that it was prepared by plaintiff's counsel. As explained further below, we recognize that the Bankruptcy Code places certain restrictions on all debtors-in-possession with respect to the use of cash collateral. However, this does not change the fact that this was a separate order entered based on a motion filed by plaintiff, contrary to defendant's counsel's representations at oral argument.

[4]This motion does not appear in the record on appeal, but in its motion for appointment of a receiver, plaintiff claimed that the motion was filed by defendant on March 16, 2015.

- 4 -

"I had said at the last hearing that what I was thinking about doing was vacating the automatic stay upon appropriate motion to permit the parties to go back to the state court or the state court to appoint the receiver. Upon reflection—and then the receiver could come back, and we could proceed with the dismissal and let things proceed.

On reflection, it occurs to me that I think that would be putting my thumb on the scale too much for one side or the other. It seems to me the state court has the option to let the debtor have the money and the property, to appoint a receiver to do it, to let the trust have the money. I have no idea what the state court would want to do.

But it strikes me that we have what is—what at this point both parties admit is a two-party dispute and that the appropriate place for that to be determined is not in this court, but in state court.

My main concern just to simplify everything and what I'm trying to accomplish—and I don't really care how we accomplish it—but this is what I want to see done, is to ensure that in the process of transferring the litigation and the dispute from this court to the state court, that neither side is advantaged or disadvantaged by the fact that the bankruptcy was filed in the first place or how the bankruptcy is dismissed."

An order granting the motion to lift the automatic stay does not appear in the record on appeal, but according to plaintiff's motion for appointment of a receiver, the bankruptcy court entered such an order on May 12, 2015.

¶ 17                                III. Postbankruptcy Proceedings

¶ 18        On May 22, 2015, plaintiff filed a new motion for the appointment of a receiver. Paragraph 9 of the motion provided:

"On April 14, 2015, the Bankruptcy Court granted the Defendant/Debtor's Motion to Dismiss but deferred dismissal of the Bankruptcy Case so that the status quo could be maintained, until Plaintiff obtained an order from this Court on either a motion for appointment of a Receiver or for other relief in order to secure the real estate and funds held by the Defendant/Debtor, during the pendency of the foreclosure case."

¶ 19        On June 8, 2015, the trial court granted plaintiff's motion. With respect to the issue of rents, the order provided that

"[t]he receiver is authorized to collect all rents relating to the Property, and the tenants of the Property are directed to pay rent to the receiver from the effective date of this order, until further notice. The receiver shall allocate all receipts from the operation of the real estate and other property subject to the mortgage in accordance with 735 ILCS 5/15-1704(d) [(West 2014)]. Within 21 days, the receiver shall provide notice to any and all occupants of the property as required by 735 ILCS 5/1704(f) [(West 2014)]. The receiver shall also have the right to collect past due rents from the tenants of the Property."

The trial court's order became effective on June 17, 2015, upon the court's approval of the receiver's bond.

¶ 20        On the same day as the trial court granted plaintiff's motion for appointment of a receiver, it also entered a scheduling order on "[t]he motion of plaintiff *** to obtain pre-receivership rents (¶ 9 of motion)," setting a briefing schedule on the issue and setting it for hearing on July 20, 2015.

¶ 21    On June 26, 2015, defendant filed a response to plaintiff's request to receive prereceivership rents, arguing that plaintiff had no actual or constructive possession of the property until the effective date of the receiver's appointment and there was no legal support for its claim to prereceivership rents. In reply, plaintiff argued that the receiver would have been appointed in March 2014 had defendant not filed for bankruptcy protection and further argued that the cash collateral order entered by the bankruptcy court that restricted the use of the rents was "in every way the functional equivalent of a receiver." Thus, plaintiff argued that defendant should be ordered to turn over at least the rents collected after the entry of the bankruptcy court's order, which was entered on May 20, 2014. Plaintiff further claimed that it had been paying the real estate taxes owed on the property during the pendency of the bankruptcy.

¶ 22    Defendant filed a surreply to the motion, disputing plaintiff's contention that the cash collateral order was in any way analogous to the appointment of a receiver. Defendant argued that obtaining injunctive relief in bankruptcy court was a more extensive process and that the cash collateral order "is nothing more than a regurgitation of the language in the Bankruptcy Code related to the use of cash collateral." Defendant further argued that plaintiff had cited no case in which such a cash collateral order was considered to be the functional equivalent of the appointment of a receiver. Defendant also claimed that plaintiff voluntarily paid the real estate taxes owed on the property and that defendant "was willing and able to pay the real property taxes from the rents it received, but could never do so because Lender always beat it to the punch."

¶ 23    On July 20, 2015, the parties appeared before the trial court for a hearing on the motion concerning prereceivership rents and, on August 18, 2015, the trial court entered an eight-page order granting plaintiff's motion. The court found that "[u]nder the applicable Illinois Law, Bankruptcy Law, public policy, and equitable principles, [plaintiff's] interest in the proceeds of the subject real estate vested—as that term was used by the Second District in *De Kalb Bank* [*v. Purdy*, 166 Ill. App. 3d 709, 719 (1988)]—on May 20, 2014. [Citation.] As such, [plaintiff] is entitled to have those proceeds turned over to the court-appointed receiver, for use in preserving the subject property, whenever the funds are released from [defendant's] DIP [(debtor-in-possession)] account." The court found that "[u]nder Illinois law, asserting control over rents and profits through proper procedure[ ] is sufficient to vest the plaintiff's interest in those rents and profits. [Citation.] The Bankruptcy Court, on [plaintiff's] motion, asserted that type of control over the tenants' rents and other payments when it issued the May 20, 2014[,] order pursuant to 11 U.S.C. Section 363(e)." The court further found that "[t]he Bankruptcy Court's order of May 20, 2014, *** accomplished everything that appointing a receiver would have accomplished: it placed the rents in the court's control—its constructive possession—pending a determination of the parties' relative rights."

¶ 24    The court also found that equitable considerations supported the turnover of rents to the receiver:

"On the last business day prior to the scheduled hearing on [plaintiff's] motion to appoint receiver—to which [defendant] had filed no objection within the time allowed, waiving its right to argue in opposition to that motion—[defendant] filed a petition for reorganization under Chapter 11. [Plaintiff] consistently asserted its interest in the property's proceeds during the bankruptcy case, and obtained a court order in relation thereto. To allow [defendant] to collect rents from well after March 17, 2014—when

- 6 -

this court would have appointed a receiver but for [defendant's] unsuccessful bankruptcy petition—seems abundantly unfair. Such a holding could encourage other debtors to file borderline-frivolous bankruptcy petitions to delay adverse foreclosure orders, wasting the judicial resources of both the Bankruptcy Court as well as this court."

¶ 25 On September 29, 2015, plaintiff filed an amended motion for summary judgment.[5] The merits of the amended motion for summary judgment are not at issue on appeal. However, as part of the amended motion for summary judgment, plaintiff requested $572,355.44 in attorney fees, as provided in the loan documents. Attached to the motion for summary judgment was a "schedule" of the invoices supporting plaintiff's request for attorney fees, redacted copies of which plaintiff claimed it had produced to defendant. The schedule listed 57 invoices dating from December 31, 2012, through September 9, 2015, 43 of which stated that they had been produced, and the schedule indicated that the invoices had a total value of $578,974.71, with $549,400.58 in fees and $29,574.13 in costs.

¶ 26 Also attached to the amended motion for summary judgment was the affidavit of Gregory Akins, a senior vice president at plaintiff servicer.[6] With respect to the issue of attorney fees, Akins averred that "[a]s of the date of this Affidavit, the Loan remains outstanding and the total amount due and owing under the Loan Document is $5,009,794.05, which consists of: *** (vi) legal expenses total[ling] $572,355.44 as of September 1, 2015." Akins further averred: "The fees and expenses detailed in Exhibits 4 and 5[7] were all incurred in connection with the Trust's efforts to enforce the Loan Documents and have been paid or are in the process of being paid."

¶ 27 Finally, attached to the amended motion for summary judgment was an affidavit of Brent Procida, a New York attorney who was a partner in the law firm retained by plaintiff servicer in connection with the foreclosure action; Procida averred that he had been allowed, pursuant to Illinois Supreme Court Rule 707 (eff. July 1, 2007), to represent plaintiff in the instant litigation and *pro hac vice* in the bankruptcy court and that, over time, he became the primary attorney working on the instant litigation. Procida averred that he was personally involved with the legal services rendered to plaintiff in connection with (1) the instant cause, (2) the bankruptcy case, (3) an adversary proceeding in bankruptcy court, and (4) a pending action in the circuit court of Cook County concerning a purported guaranty executed by defendant's principals. With respect to the issue of attorney fees, Procida averred:

"9. The attorneys' fees charged by [the firm] are based upon the amount of time spent on a particular client matter. We keep track of our time by filling out time sheets on a daily basis. The information from those time sheets is then made into an itemized invoice by using our computer billing program. I occasionally review the invoices to

---

[5]Plaintiff had previously filed a motion for summary judgment on November 4, 2013, prior to the bankruptcy action. However, that motion does not appear to have been heard.

[6]Akins previously provided an affidavit that was attached to plaintiff's initial motion for summary judgment. The affidavit attached to the amended motion for summary judgment is slightly different and was dated September 21, 2015.

[7]Exhibit 4 was the schedule of attorney fees previously discussed. Exhibit 5 was a "Loan Expense Report" that appears to set forth a list of loan-related expenses, such as appraisals and title insurance.

assure the accuracy and reliability of this system of generating invoices, and I have found it to be reliable and accurate.

    10. My billing rate during the life span of this case has ranged from $550 to $600 per hour. A detailed listing of the attorneys' fees incurred by the Trust with regard to the above-captioned cause is attached to the Motion as Exhibit 4 and redacted invoices of all legal fees and expenses incurred through August 31, 2015 have been produced to [defendant].

    11. I defer to the Court for the determination of the customary hourly rate for a Chicago attorney of similar experience. However, I note that [defendant's] lead counsel for the majority of this case *** has an hourly billing rate of $530."

¶ 28    In its response to plaintiff's amended motion for summary judgment, with respect to the issue of attorney fees, defendant first argued that some of the amounts claimed by plaintiff were double-counted because they were incurred during the forbearance period, for which defendant had already paid a $30,000 forbearance fee "which was to be applied, in part, towards attorneys' fees incurred by Lender during the forbearance period(s)." Additionally, defendant argued that plaintiff had failed to provide documentation to substantiate the fees, providing only redacted invoices to defendant's counsel. Defendant further argued that the mortgage only provided for limited attorney fees that were "incident" to the mortgage foreclosure or were incurred in efforts "to enforce any terms of this Mortgage" and questioned how it was to determine whether such claimed fees were recoverable if plaintiff refused to provide unredacted copies of the invoices. Defendant argued that "[t]his is especially critical in this situation wherein the Lender has separately filed a cause of action against the guarantors of the Note and Loan. Any fees and expenses related to that claim is not recoverable under the Note and Mortgage. And, in that separate action, the Lender has lost multiple motions, and there is no way that they could ever recover fees related to claims or motions that the Lender was unsuccessful in. Each separate line item in the entries needs to be scrutinized (even if the Court finds that the Lender is entitled to recover the fees sought)."[8]

¶ 29    In its reply, with respect to the issue of attorney fees, plaintiff argued that defendant was citing the incorrect language in the mortgage and that the mortgage permitted recovery of any fees "incurred in any action related to the recovery of the Debt." (Emphasis omitted.) Plaintiff further argued that "[c]oncerning evidence of the fees, the Defendant has been provided with redacted timesheets for every invoice included in the total amount due and multiple affidavits. Discovery is long since closed and the Defendant has never (i) asked the Plaintiff to reconsider its redactions; (ii) sought to compel production of additional information; or (iii) conducted any depositions or other discovery concerning the legal fees."

¶ 30    In a surresponse to the amended motion for summary judgment, defendant claimed that it had repeatedly requested unredacted copies of the invoices but such requests had not been granted. Defendant also claimed that the invoices redacted the explanations for the fees and left only the numbers unredacted and pointed to the fact that the invoices had never been attached to plaintiff's motion or its reply, leaving a court unable to review them.

¶ 31    In its surreply to the amended motion for summary judgment, plaintiff claimed that on March 18, 2016, it provided defendant's counsel with additional copies of all timesheets accounting for fees and expenses, attached to a supplemental affidavit from Akins. Plaintiff

---

[8]Plaintiff ultimately withdrew its request for attorney fees concerning this matter.

further claimed that it "has provided the Court with a wholly unreacted [*sic*] set of timesheets for in camera review." Attached to the surresponse was the "second supplemental affidavit" of Akins. With respect to the issue of attorney fees, Akins averred:

"8. Attached to the Surreply as Exhibits S3 and S4 are true and correct summaries showing the monthly legal fees and [plaintiff servicer's] record of expenses incurred from the start of this case through March 1, 2016. Exhibits S3 and S4 update Exhibits 4 and 5 to the Amended Motion to reflect the fees and expenses incurred since September 1, 2015.

\*\*\*

10. The total legal fees and expenses incurred in this case from inception through March 1, 2016 are \$670,008.28.

11. These fees and expenses were all incurred in connection with the Plaintiff's efforts to enforce the Loan Documents and recover the Debt.

12. Nevertheless, in the exercise of its billing discretion, the Plaintiff has identified and removed from this petition 197.5 hours resulting in \$92,283.00 of fees incurred in connection with litigation to enforce the guaranty. These fees are itemized in the attached Exhibit S7.

13. Detailed timesheet records for the legal fees and expenses incurred by [plaintiff servicer] from the inception of this case through March 1, 2016 are attached to the Surreply as Exhibit S8 and are separately attached to this affidavit. These time sheets have been redacted by counsel and true and correct copies of an unredacted set are being delivered to Judge Loftus for in camera review.

14. The fees and expenses sought in this case were incurred at the usual and customary rates paid by [plaintiff servicer] for national and local counsel in similar cases. These fees and expenses have all actually been paid, or in the case of the most recent invoices, are in the process of being paid.

15. Attorney fees and expenses continue to accrue as the Defendant continues to resist even the most routine action in this case."

Also attached to the surreply were approximately 126 pages of lightly redacted timesheets detailing the legal work that plaintiff's counsel had performed during the course of the litigation.

¶ 32    During the pendency of the briefing on the amended motion for summary judgment, on November 17, 2015, plaintiff filed a motion for disbursement of surplus funds, stating that the receiver had approximately \$479,000 in its operating account for the property and that the receiver was comfortable releasing \$400,000 in surplus funds from the operating account. Accordingly, plaintiff sought the disbursement of \$400,000 to plaintiff in accordance with the terms of the loan documents.

¶ 33    In response to the motion for disbursement, defendant argued, in part, that a portion of the "Surplus Funds" identified by the receiver included the \$278,341.10 in prereceivership rents that defendant had turned over to the receiver after the trial court's August 18, 2015, order. Defendant argued that permitting these funds to be turned over to plaintiff would render any appeal of this order moot, as the appellate court would be unable to grant effectual relief if the funds had already been disbursed.

¶ 34       Also during the pendency of the briefing on the amended motion for summary judgment, on March 17, 2016, defendant filed an objection to the receiver's second report, arguing, in relevant part, that there was no mention in the report of paying Milestone, LLC (Milestone), the property manager. The objection noted that Milestone had agreed to perform management services without pay while the property maintained a negative cash flow, accruing its fees until the property returned to positive cash flow. However, Milestone had not been paid for the services it had provided prior to the appointment of the receiver, and defendant argued that such payments should come from the prereceivership rents that the receiver had received from defendant.

¶ 35       In response to defendant's objection to the receiver's second report, plaintiff argued that plaintiff had a perfected security interest in the funds held by the receiver while Milestone and other creditors did not, so plaintiff's interest in the rents was superior to all other unpaid invoices. Plaintiff further argued that Milestone's invoices were contractually subordinated to the loan, pointing to language in an agreement executed by Milestone that provided that "the rights of the Undersigned under the Contract to receive any compensation, reimbursement of costs and expenses or other payments in consideration for its management services for the Premises shall be and remain subordinate in all respects to the Lender's rights under Loan Documents."

¶ 36       On March 25, 2016, the parties appeared before the trial court for hearings on the amended motion for summary judgment, the objection to the receiver's second report, and the request for disbursement of surplus funds. At the beginning of the hearing, defendant's counsel expressed concern about the fact that defendant had only received the updated, less-redacted versions of the attorney fees invoices a few days prior to the hearing, and the trial court suggested that "let's just table that. Okay? There's a lot going on here and because of this issue we will address it at another time." Plaintiff's counsel, after arguing the merits of the motion for summary judgment, also made several arguments about the attorney fees and suggested that a second hearing would not have any additional benefit because "you're never going to have more information or better information in front of you than this to make a judgment on this." The court responded:

"Well, and here's the issue though. As counsel apparently did not get the lightly redacted copies of the bills until recently. A lot of the arguments you've raised regarding the fees are moreover arching [*sic*] than the specific fees that he's going to be reviewing. But I want to continue the discussion on the attorney's fees for a second hearing and any argument raised today will be incorporated into that hearing.

So anything that you've already argued is going to be incorporated into that but counsel should have time to look at the documents that he received and make the arguments based upon those documents. I'm not going to have any further briefing. It's just going to be arguments. So we'll limit fees charged.

And I don't know if co-counsel can argue the remaining part of that at another time. So that you wouldn't have to be present. If you want to be present by phone and her be present as argument. There's ways we can limit the amount of fees but this is not—I'm not going to rule on the fee issue today, just in fairness to counsel."

¶ 37       At the beginning of defendant's argument, defense counsel and the court confirmed that the attorney fees issue would be decided at a later hearing:

"DEFENSE COUNSEL: *** I just want to make sure we're clear for the record. It sounds like based on what we have talked about, I'll only give you the overview on the attorney's fees without trying my best to give you what I had the associate do yesterday. So we can continue that part.

THE COURT: And just so we can confirm, I'm not going to be ruling on that today. So any arguments today would be incorporated into the arguments on another date."

Defense counsel then proceeded to argue the merits of the motion for summary judgment, arguing the attorney fees issue to challenge whether plaintiff's affidavits were adequately supported but noting that "[t]he reasonableness of fees, I'll save that until next time."

¶ 38　　At the end of the hearing, the trial court found:

"With respect to the motion for summary judgment, I am going to enter judgment of liability today. As with respect to the amounts due and owing in part because I want to review the arguments made today and review the briefs but also due to the fact we have [the] outstanding attorney fee issue, I'm going to reserve ruling on the amounts due and owing."

On that date, the trial court also entered a written order granting the amended motion for summary judgment as to liability and setting the issue of attorney fees for oral argument on April 22, 2016; the April 22 hearing date was later continued to May 20. In the same order, the trial court ordered disbursement of $200,000 in surplus funds from the receiver to plaintiff.

¶ 39　　There is no transcript of a May 20, 2016, hearing on the issue of attorney fees. However, on that date, the trial court entered an order granting summary judgment in plaintiff's favor "for the amount due & owing as set forth in the record." On July 22, 2016, the trial court entered a judgment of foreclosure and sale. The judgment order stated that "[b]y virtue of the Note and Mortgage, there is due to the Plaintiff" $5,027,581.43, which included $663,389.01 in "Legal Expenses (12/12-2/16)" and $30,190.21 in "Servicer Expenses."

¶ 40　　The property was sold at a public auction, and plaintiff was the successful bidder with a credit bid of $4 million.

¶ 41　　On October 6, 2016, plaintiff filed a motion to terminate the receivership and approve the disbursement of the receivership funds to plaintiff.

¶ 42　　On October 21, 2016, the trial court entered an order for defendant to file a separate brief with regard to the Milestone invoices, which defendant did. Defendant claimed that Milestone's fees, which it had agreed to accrue until the property returned to positive cash flow, and other unpaid expenses amounted to $692,366.16 as of June 22, 2015; Milestone's accrued management fees alone totaled nearly $100,000. In response, plaintiff claimed that Milestone's management fees were $32,500 and were contractually subordinated to plaintiff's interest in the property.

¶ 43　　On January 6, 2017, the parties appeared before the trial court for hearing on plaintiff's motion to confirm the sale, on plaintiff's motion to terminate the receivership and approve disbursement of the funds, and on the issue concerning payment of the Milestone invoices. During the hearing, defendant's counsel clarified that it was seeking only $32,500 for Milestone's fees. After hearing the arguments of the parties, the court found, with respect to Milestone:

"I think that the—my ruling is, is that the consent and agreement of manager document, specifically Section 5 of the third full paragraph, the subordination

agreement controls here; and regardless of whether the work done by Milestone was ratified or objected to, there had been an alleged default, a complaint filed prior to the months that Milestone allegedly managed the property and accrued these invoices. So I think that's where the analysis stops.

It would have—I'm, as well, not a bankruptcy aficionado, but I think in this case since we do have a subordination agreement that it controls and regardless of whether my August 18th, 2015 order provided for the ability to bring these issues to my attention, that does not mean that I was going to automatically agree to it, especially given at the time I wrote the August 18th, 2015 order I was not aware of any consent agreement and certainly of any language or subordination agreement. So that is my order."

The trial court also entered an order in which it found, *inter alia*, that Milestone should not be paid out of the receiver funds. On the same day, the court entered an order confirming the sale of the property and awarding possession to plaintiff. In the order, the trial court found that there remained an *in rem* deficiency judgment of $1,276,008.47. On January 13, 2017, the trial court entered an order approving the receiver's final report, discharging the receiver, and ordering turnover to plaintiff of the remaining funds after payment of expenses. In the order, the trial court ordered that "[t]he Receiver shall transmit all property and any remaining funds on hand in the amount of $594,782.80 to the Plaintiff *** for application to the deficiency judgment."

¶ 44    On February 3, 2017, defendant filed a notice of appeal, requesting a finding that defendant was entitled to the prereceivership rents and that the invoices submitted by Milestone to the receiver should have been paid out of receivership funds.

¶ 45                                        ANALYSIS

¶ 46    On appeal, defendant makes three arguments: (1) that the trial court erred in requiring defendant to turn over prereceivership rents, (2) that the trial court erred in denying payment to Milestone, and (3) that the trial court erred in awarding plaintiff attorney fees. We consider each issue in turn.

¶ 47                          I. Turnover of Prereceivership Rents

¶ 48    The first issue raised by defendant is whether the trial court erred in ordering defendant to turn over prereceivership rents to the receiver, an issue that presents a case of first impression for this court. The question of whether rents belong to the mortgagor or to the mortgagee has been considered by our courts several times, and the general law surrounding the issue is not disputed by the parties. "Generally in Illinois, 'a mortgagor[/debtor], as the party in possession and owner of [a] statutory right of redemption, is entitled to any rents generated from the property as long as [the mortgagor] retains possession, without having to account for them to the mortgagee[/lender].' " *BMO Harris Bank N.A. v. Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶ 34 (quoting *In re Wheaton Oaks Office Partners Ltd. Partnership*, 27 F.3d 1234, 1241 (7th Cir. 1994)). However, " 'Illinois allows mortgagees to include in their mortgages assignment[-]of[-]rents clauses, giving them[, preforeclosure,] a sufficient interest in the rents to authorize the appointment of a receiver through whom the mortgagee can begin collecting rents.' " *Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶ 34 (quoting *Wheaton Oaks*, 27 F.3d at 1242).

¶ 49    "[A] clause in a real estate mortgage pledging rents and profits creates an equitable lien upon such rents and profits of the land, which may be enforced by the mortgagee upon default by taking possession of the mortgaged property." *Anna National Bank v. Prater*, 154 Ill. App. 3d 6, 17 (1987). "At common law, it was strictly held that the mortgagee must take actual possession before he was entitled to rents." *Comerica Bank-Illinois v. Harris Bank Hinsdale*, 284 Ill. App. 3d 1030, 1033 (1996). "The possession requirement reflects the public policy in Illinois that seeks to prevent mortgagees from stripping the rents from the property and leaving the mortgagor and the tenants without resources for maintenance or repair." *Comerica Bank*, 284 Ill. App. 3d at 1033.

¶ 50    However, in *Comerica Bank,* the court recognized that "there is a modern trend in this area of the law which permits a mortgagee to collect rents once it has taken constructive, as opposed to actual, possession of the property. [Citation.] Courts have recently allowed mortgagees to collect rents after taking some affirmative action to gain possession of the property [citation], such as obtaining judicial intervention by way of injunctive relief. [Citation.] Similarly, courts have ruled that mortgagees may be entitled to rents once a receiver has been appointed. [Citation.]" *Comerica Bank*, 284 Ill. App. 3d at 1034. Even under the theory of constructive possession, however, "a mortgagee still needs to obtain a court's authorization before he may collect rents without taking possession. Such a requirement ensures that all of the parties' interests will be before the court and will not be subject to the unilateral acts of the mortgagee." *Comerica Bank*, 284 Ill. App. 3d at 1034. Furthermore, the mere filing of a request does not constitute sufficient action on the mortgagee's part; "it is not the mere filing of certain pleadings but, rather the trial court's affirmative ruling on such filings that entitles the mortgagee to the rents." *Comerica Bank*, 284 Ill. App. 3d at 1035.

¶ 51    In the case at bar, plaintiff argues that the cash collateral order entered by the bankruptcy court is sufficient to establish constructive possession so as to entitle it to the prereceivership rents. We note that defendant repeatedly points to the absence of any case interpreting such an order in this way, implying that plaintiff's position is unreasonable. While it is technically true that there is no case providing such an interpretation, there does not appear to be any case law concerning this issue at all—it appears to be an issue of first impression in this state. Thus, we must determine whether the order entered by the bankruptcy court constituted "court authorization" so as to entitle plaintiff to the prereceivership rents.

¶ 52    In our analysis, it is helpful to consider what actions other courts have considered to be sufficient—or insufficient—to entitle a mortgagee to prejudgment rents. We begin with *Comerica Bank*, which is the leading authority on the issue. See *Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶ 38 ("The *Comerica* court was the first to hold that constructive possession to enforce an assignment-of-rents provision must include court authorization."). In that case, there were two separate mortgagees seeking prejudgment rents. First, upon the mortgagor's default, the first mortgagee "chose to exercise its rights under the assignment of rents. [The mortgagee] began collecting rents from the property without foreclosing, seeking the appointment of a receiver, or obtaining authorization from a court. This option permitted [the mortgagee] to reduce the debt without assuming responsibility for the property or the large tax obligation." *Comerica Bank*, 284 Ill. App. 3d at 1032. On appeal, the court found that the mortgagee was not entitled to the rents because, "even under the more progressive 'affirmative

- 13 -

action' cases, a mortgagee still needs to obtain a court's authorization before he may collect rents without taking possession."[9] *Comerica Bank*, 284 Ill. App. 3d at 1034.

¶ 53    Additionally, a second mortgagee foreclosed its mortgage and sought an accounting, the appointment of a receiver, and a return of the rents from the first mortgagee. *Comerica Bank*, 284 Ill. App. 3d at 1032. The second mortgagee "claim[ed] that filing a foreclosure action and seeking the appointment of a receiver constitute[d] the necessary affirmative action which entitled it to the rents." *Comerica Bank*, 284 Ill. App. 3d at 1034. The appellate court disagreed, finding that "the mere filing of the foreclosure action or request for a receiver is not sufficient to trigger the mortgagee's right to collect rents." *Comerica Bank*, 284 Ill. App. 3d at 1034. The court found that "it is not the mere filing of certain pleadings but, rather the trial court's affirmative ruling on such filings that entitles the mortgagee to the rents." *Comerica Bank*, 284 Ill. App. 3d at 1035. Since the rents were collected during the time that the mortgagor was in possession of the property but before the receiver was appointed, the court found that the rents collected belonged to the mortgagor. *Comerica Bank*, 284 Ill. App. 3d at 1035.

¶ 54    One of the cases relied on by *Comerica Bank* in its analysis was *De Kalb Bank v. Purdy*, 166 Ill. App. 3d 709 (1988). There, instead of seeking appointment of a receiver, the plaintiff sought and received an injunction, which prohibited the defendants from disposing of any rents that had already been received and ordering all future rents to be turned over to the clerk of the court pending a final hearing on the merits. *Purdy*, 166 Ill. App. 3d at 715. On appeal, the defendants argued that "the actions of plaintiff in obtaining an order of injunction sequestering the rents was not equivalent to the entering and taking possession required, and, therefore, [the defendants], as a mortgagor in possession, [were] entitled to rents deposited with the court." *Purdy*, 166 Ill. App. 3d at 714-15. The appellate court affirmed the trial court's judgment, noting that the trial court could have appointed a receiver but was not required to do so. *Purdy*, 166 Ill. App. 3d at 717. The court noted that "[a] receivership is like a preliminary injunction in that both are forms of equitable relief, and, in the instant case, the injunctive relief merely served to accomplish the objectives of receivership. [Citation.] The October 26, 1984, order of the court placed the disputed rents in the possession of the court pending a final determination of the rights of the parties to the rents. The appointment of a receiver would have accomplished nothing more." *Purdy*, 166 Ill. App. 3d at 716. The court further noted that "[a] receivership is not the only method by which a contract, such as a mortgage whereby rents and profits are conveyed with real estate as security for a debt, may be enforced, but the court may, in its discretion, use whatever method seems best as the necessities and exigencies of the situation may require." *Purdy*, 166 Ill. App. 3d at 717.

¶ 55    Similarly, in *State Bank & Trust Co. v. Massion*, 279 Ill. App. 234 (1935),[10] the court found sufficient evidence of possession in the absence of a receiver. There, the plaintiff had

---

[9]We note that the holding concerning the first mortgagee's entitlement to the rents occurred in the context of the second mortgagee's appeal, as the first mortgagee's appeal was found to be moot because the first mortgagee settled with the mortgagor, which included an assignment of the mortgagor's right to the rents to the first mortgagee. *Comerica Bank*, 284 Ill. App. 3d at 1033.

[10]We note that "[a]ppellate court decisions issued prior to 1935 had no binding authority." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996); see also *Chicago Title & Trust Co. v. Vance*, 175 Ill. App. 3d 600, 606 (1988) (explaining that appellate decisions were not binding authority until the amendment of the Courts Act in 1935 (citing Ill. Rev. Stat. 1935, ch. 37, ¶ 41)). As *Massion*

requested the appointment of a receiver during its foreclosure of a trust deed, but no receiver was ever appointed. Instead, the court entered an order "ordering defendant to turn over the moneys in her hands to the clerk of the court to await the further orders of the court, and also ordering that [the rental agents who had been collecting rents] forthwith deliver to the defendant, or the clerk of the court, all the moneys received from the tenants of the building"; the defendant was also ordered to pay certain expenses and subsequently requested, and received, authorization to pay other building expenses from time to time. *Massion*, 279 Ill. App. at 236-37. On appeal, the court found that the plaintiff was entitled to the rents, finding that, "[w]hile it is true that the owner of the equity of redemption is entitled to the rents of the mortgaged premises until the mortgagee takes actual possession or until a receiver is appointed and takes possession, yet, viewing the proceedings heretofore noted, the conclusion is manifest that the order of the court that defendant should remain in possession of the premises, collect the rents, deposit them with the court, pay expenses of operation under orders of the court, was in practical effect the appointment of a receiver by the court." *Massion*, 279 Ill. App. at 239.

¶ 56        More recently, in *Joe Contarino, Inc.*, the Second District discussed situations in which no court authorization at all was required for a mortgagee to enforce an assignment-of-rents clause. There, two parties sought rents collected by the defendants' property manager from a number of the defendants' properties—the plaintiff, a mortgagee who had obtained a foreclosure judgment against the defendants and was attempting to collect on the judgment, and a set of three adverse claimants, who were mortgagees on different mortgages and who had entered into forbearance agreements with the defendants through which the property manager directly transmitted the rents on their properties to the mortgagees. *Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶¶ 4-11. The trial court found that the adverse claimants held a superior lien on the rents, and the plaintiff appealed. *Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶ 27. While much of the court's discussion is not applicable to the issue before this court, the court did note that in enforcing an assignment-of-rents clause, "[t]here is some authority for the proposition that a lockbox arrangement or other direct-payment system constitutes sufficient enforcement of an assignment of rents; thus, under this view, court authorization is not the only enforcement mechanism." *Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶ 46 (citing *West Bend Mutual Insurance Co. v. Belmont State Corp.*, 712 F.3d 1030, 1035 (7th Cir. 2013)). The court found that the defendants "contracted away in the forbearance agreements [their] right to receive the rents, which, after deduction of property expenses, [the property manager] directly forwarded to Adverse Claimants," which showed that the parties chose a method of enforcing the assignment of rents that did not require court authorization. *Joe Contarino, Inc.*, 2017 IL App (2d) 160371, ¶ 59.

¶ 57        Finally, in the bankruptcy case of *In re J.D. Monarch Development Co.*, 153 B.R. 829 (Bankr. S.D. Ill. 1993), the bankruptcy court made clear that at least some affirmative action by the mortgagee was required before constructive possession would be found. There, the defendant had filed for Chapter 11 bankruptcy and, during the course of the bankruptcy, defaulted on its mortgage. *J.D. Monarch*, 153 B.R. at 831. The mortgagee sought and obtained

_____

was decided in 1935, it technically "had *** binding authority" when it was issued. *Bryson*, 174 Ill. 2d at 95. However, even if it did not, it would remain instructive as persuasive authority (see, *e.g.*, *North Shore Community Bank & Trust Co. v. Kollar*, 304 Ill. App. 3d 838, 844 (1999) (relying on pre-1935 cases as persuasive authority)), and we discuss it because it is relied on by defendant in the case at bar and has also been discussed in many of the cases we include in our analysis.

relief from the bankruptcy stay in order to commence foreclosure proceedings in state court; during the course of the foreclosure proceeding, the bankruptcy was converted to a Chapter 7 bankruptcy proceeding, and the rents from the debtor-in-possession account were turned over to the bankruptcy trustee. *J.D. Monarch*, 153 B.R. at 831. After the property was sold at a judicial sale, the mortgagee filed an action in bankruptcy court to recover the rents held by the trustee to be applied to the deficiency remaining on its mortgages. *J.D. Monarch*, 153 B.R. at 831-32. The mortgagee argued that "it was not required to obtain possession of the real estate to be entitled to these rents because the rents were being collected during bankruptcy by the debtor-in-possession and the apartment management firm under authority of the court and subject to court control. The [mortgagee] contend[ed] that any action on its part to seek possession of the property or appointment of a receiver during bankruptcy would have been superfluous and that [its] failure to obtain possession did not affect its perfected lien on the rents." *J.D. Monarch*, 153 B.R. at 832. The bankruptcy court disagreed, finding that, "[w]hile the debtor's bankruptcy filing created an estate to be administered by the debtor-in-possession and the trustee under authority of the Court, it did not alter the relationship between the [mortgagee] and the debtor regarding possession of the mortgaged property. Rather, absent action by the [mortgagee] to enforce its assignment of rents, the debtor was entitled to receive rents from the property until being divested of possession by sale of the property upon foreclosure." *J.D. Monarch*, 153 B.R. at 834. The court found that the mortgagee "did nothing *** to obtain a court order equivalent to a state court receivership but, instead, allowed the trustee and debtor-in-possession to collect rents for the bankruptcy estate as successors to the debtor's interest. It cannot be said, therefore, that this collection of rents enforced the [mortgagee's] lien on the rents, and the Court, accordingly, rejects such contention by the [mortgagee]." *J.D. Monarch*, 153 B.R. at 835.

¶ 58    In the case at bar, in the bankruptcy case, on May 14, 2014, plaintiff filed a motion in which plaintiff requested that the rents collected from the property's tenants be considered "cash collateral" pursuant to the Bankruptcy Code (11 U.S.C. § 363(a) (2012)) and that defendant be prohibited from using such cash collateral. On May 20, 2014, the bankruptcy court entered an order that "the Debtor is prohibited from using any proceeds of the real property *** without permission from the Trust or Court authorization" and further ordering defendant to segregate all proceeds of the property. We agree with the trial court that this order is sufficient to show that plaintiff obtained constructive possession over the rents as of that date.

¶ 59    While the simplest way to show constructive possession would be the appointment of a receiver, our courts have made it clear that "[a] receivership is not the only method by which a contract, such as a mortgage whereby rents and profits are conveyed with real estate as security for a debt, may be enforced, but the court may, in its discretion, use whatever method seems best as the necessities and exigencies of the situation may require." *Purdy*, 166 Ill. App. 3d at 717. Thus, we consider whether plaintiff has taken "some affirmative action to gain possession of the property." *Comerica Bank*, 284 Ill. App. 3d at 1034. Here, plaintiff filed a motion specifically requesting that the rents be considered to be cash collateral and that defendant be prohibited from using the rents without court authorization, and this motion was granted by the bankruptcy court. Thus, after entry of the order, defendant was unable to use the rents without court approval and, indeed, was found in contempt when it impermissibly used those funds and was ordered to return them.

¶ 60    We find the reasoning in *Purdy* and *Massion* to be instructive to the instant case. In both cases, there was no receiver appointed, yet the appellate court found that the actions taken by the mortgagee were sufficient to establish possession over the property. In *Purdy*, where the mortgagee had received an injunction prohibiting the use of the rents and ordering them turned over to the clerk of the court, the court noted that "[a] receivership is like a preliminary injunction in that both are forms of equitable relief, and, in the instant case, the injunctive relief merely served to accomplish the objectives of receivership. [Citation.] The October 26, 1984, order of the court placed the disputed rents in the possession of the court pending a final determination of the rights of the parties to the rents. The appointment of a receiver would have accomplished nothing more." *Purdy*, 166 Ill. App. 3d at 716. The court further noted that "[a] receivership is not the only method by which a contract, such as a mortgage whereby rents and profits are conveyed with real estate as security for a debt, may be enforced, but the court may, in its discretion, use whatever method seems best as the necessities and exigencies of the situation may require." *Purdy*, 166 Ill. App. 3d at 717. Likewise, in *Massion*, where the defendant was ordered to collect the rents and deposit them with the clerk of the court, the court noted that, "[w]hile it is true that the owner of the equity of redemption is entitled to the rents of the mortgaged premises until the mortgagee takes actual possession or until a receiver is appointed and takes possession, yet, viewing the proceedings heretofore noted, the conclusion is manifest that the order of the court that defendant should remain in possession of the premises, collect the rents, deposit them with the court, pay expenses of operation under orders of the court, was in practical effect the appointment of a receiver by the court." *Massion*, 279 Ill. App. at 239.

¶ 61    Similarly, here, the cash collateral order entered by the bankruptcy court placed the disputed rents in the control of the court because, although they physically remained in defendant's account, they could not be used without court authorization. We note that, as defendant points out, the language in the cash collateral order entered by the bankruptcy court is similar to the language of 11 U.S.C. § 363(c)(2), which provides that a debtor may not use, sell, or lease cash collateral without court authorization or the consent of each entity that has an interest in such cash collateral. However, the dispositive fact in the instant case is that plaintiff affirmatively sought and received a court order that (1) the particular rents at issue were cash collateral and (2) defendant was required to segregate the rents and was prohibited from using them without plaintiff's consent or court authorization. We make no findings concerning whether, in the absence of such affirmative action on plaintiff's part, a mortgagee would be entitled to rents collected during a bankruptcy. See *J.D. Monarch*, 153 B.R. at 835 (finding that a mortgagee was not entitled to rents held by the bankruptcy trustee where the mortgagee did not take any action to enforce its interest in the rents).[11]

¶ 62    We further note that defendant's possession of the rents occurred in the context of the bankruptcy proceeding, meaning that defendant's status changed from a defendant to a debtor.

---

[11]We note that *J.D. Monarch* is further distinguishable because the mortgagor in that case was involved in bankruptcy proceedings prior to the default, and the mortgagee was able to obtain relief from the bankruptcy stay in order to commence foreclosure proceedings, making its failure to seek any relief, such as the appointment of a receiver, particularly troublesome. See *J.D. Monarch*, 153 B.R. at 831. In the case at bar, by contrast, plaintiff sought a receiver in the foreclosure action prior to the bankruptcy and, once the stay was lifted, immediately renewed its request for a receiver, which was then appointed.

" '[A] Chapter 11 debtor is a fiduciary of his creditors and the estate. [Citation.] A debtor-in-possession holds its powers in trust for the benefit of the creditors and has the duty to protect and conserve property in his possession for their benefit. [Citations.]' " *In re Weiss*, 376 B.R. 867, 880 (Bankr. N.D. Ill. 2007) (quoting *In re Schipper*, 109 B.R. 832, 835 (Bankr. N.D. Ill. 1989)). Thus, while the disputed rents remained in defendant's account until the receiver was appointed, defendant's hands were effectively tied with respect to the use of these funds without court permission.

¶ 63    Defendant argues that *Purdy* should not be interpreted broadly, pointing to *Fidelity Mutual Life Insurance Co. v. American National Bank & Trust Co. of Chicago*, No. 93 C 6436, 1994 WL 67852 (N.D. Ill. Feb. 24, 1994). First, we note that this cited case is an unpublished federal district court case. "Unreported decisions have no precedential value, and this is even more true for decisions from foreign jurisdictions." *American Family Mutual Insurance Co. v. Plunkett*, 2014 IL App (1st) 131631, ¶ 38; *Burnette v. Stroger*, 389 Ill. App. 3d 321, 329 (2009); *West American Insurance Co. v. J.R. Construction Co.*, 334 Ill. App. 3d 75, 82 (2002) (a "foreign, unreported decision" is of no precedential value"). Specifically, with respect to unpublished federal cases, this court has found that they do not carry any authority before an Illinois court. *Lyons v. Ryan*, 324 Ill. App. 3d 1094, 1107 n.11 (2001) ("unreported federal court orders" are not "any kind of authority before an Illinois court"); *Sompolski v. Miller*, 239 Ill. App. 3d 1087, 1093 (1992) ("we decline" to follow "an unreported Federal district court decision"). While bankruptcy court cases may be instructive in the present case, as we are considering the interplay between bankruptcy law and Illinois law (see *Comerica Bank*, 284 Ill. App. 3d at 1033), *Fidelity Mutual* is not a bankruptcy court case and is simply a federal district court interpreting Illinois law in an unpublished decision with no precedential value. Furthermore, *Fidelity Mutual* is not factually analogous to the instant case at all. There, the mortgagee directed the current tenant to pay its rent to the mortgagee without any court authorization or involvement whatsoever. *Fidelity Mutual*, 1994 WL 67852, at *4. The district court found that impermissible, noting that "[the mortgagee] wants the right to control the rents without the protection afforded [the mortgagor] by a receiver or court order. [The mortgagee] is not entitled to such a result under Illinois law ***." *Fidelity Mutual*, 1994 WL 67852, at *5. In the case at bar, by contrast, plaintiff sought court authorization through the entry of a court order restricting the use of the rents.

¶ 64    We are similarly unpersuaded by defendant's reliance on *In re Markos Gurnee Partnership*, 252 B.R. 712 (Bankr. N.D. Ill. 1997), in which the bankruptcy court found that a creditor was not entitled to surplus funds that had been withheld from the creditor's adequate protection payments because the funds were not needed to protect the creditor's claim. That case did not involve the issue present in the case at bar, namely, whether the mortgagee's actions were sufficient to assert constructive possession over the rents collected during the bankruptcy. Thus, we find defendant's reliance on this case was not persuasive in analyzing the situation present before this court.

¶ 65    Additionally, although not cited by either party, we have discovered at least one bankruptcy court case, *In re Southern Gardens, Inc.*, 39 B.R. 671, 673 (Bankr. S.D. Ill. 1982), in which the court has found that a request to segregate rents was sufficient "affirmative action" to constitute constructive possession under Illinois law. In that case, the bankruptcy court found that the bankruptcy trustee, as the party in possession, was entitled to the rents until such time as some affirmative action was taken by the mortgagee. The court determined that

"[t]he question that faces the Court at this time is what form that affirmative action must take." *In re Southern Gardens*, 39 B.R. at 673. The court found: "In this case, [the mortgagee] did not formally petition the Bankruptcy Court for an order of sequestration, but it did demand that the Trustee set apart the rents or that the Trustee turn the rents over to the Trustee. This is enough of an affirmative action, under Illinois law, to entitle [the mortgagee] to the rent proceeds from the date of the demand." *In re Southern Gardens*, 39 B.R. at 673. This case provides further support for our conclusion that the trial court did not err in ordering the turnover of prereceivership rents.

¶ 66    As a final matter, we note that defendant repeatedly claims that "the only perfected interest [plaintiff] had as of the date of the bankruptcy case was its mortgage on [defendant's] property." Thus, defendant claims that plaintiff "received a windfall" because it was awarded prereceivership rents in addition to the adequate protection payments it received during the bankruptcy and "the full value of its collateral" received through foreclosure. However, this is not accurate. Under the Conveyances Act, "[i]f an instrument assigning the interest of the assignor in rents arising from the real property described in the instrument is recorded, pursuant to this Act, in the county in which the real property is situated, then the interest of the assignee in those rents is perfected upon that recordation without the assignee taking any other affirmative action." 765 ILCS 5/31.5(b) (West 2014). Thus, since the assignment of rents was recorded, plaintiff had a perfected interest in the rents prior to the date of the bankruptcy case. While it remains the case that plaintiff would not have been entitled to collect the rents until it took steps to *enforce* its interest (765 ILCS 5/31.5(d) (West 2014)), it is a misstatement for defendant to repeatedly claim that plaintiff's interest in the rents had not been *perfected* at the time of the bankruptcy filing. Accordingly, its argument in its reply brief that "Cash Collateral Orders Preserve the Status Quo as of the Time of a Bankruptcy Filing and Does [*sic*] Not Perfect a Previously Unperfected Security Interest" is both inaccurate and irrelevant to the issue in the case at bar, namely, whether plaintiff took an "affirmative action" to assert control over the rents by requesting and obtaining a separate "cash collateral" order with respect to the rents.[12] Furthermore, the fact that cash collateral may be used with court authorization so long as the creditor's interest is adequately protected is not a persuasive distinction in the case at bar—as the trial court noted, "that contention is not supported by the record in this case. [Defendant] appears to be a single-purpose entity in the business exclusively of running the subject property. This is not a situation where a cash collateral order encumbers the proceeds in one of many accounts owned by a more diverse business. Without more, this court sees no basis for concluding that the scope of [the] Bankruptcy Court's order differed from that of an ordinary receivership."

¶ 67    We also must highlight that, in the order ordering the turnover of the prereceivership rents to the receiver, the court specifically found that "[t]he property's maintenance has been, and will continue to be, the duty of the representative collecting rents. During the pendency of the Bankruptcy case, [defendant] acted as that representative, as debtor in possession. *** Now, and for the remainder of the foreclosure, the receiver has the duty to collect rents and maintain

---

[12]Defendant's argument also does not acknowledge that the $240,000 in adequate protection payments received by plaintiff was deducted from the amount of the foreclosure judgment, making it difficult to see how plaintiff "received more than it was entitled to in the bankruptcy case, and certainly not less, by its receipt of the adequate protection payments, plus the full value of its collateral through foreclosure of its mortgage."

- 19 -

the subject property. *** Allowing the receiver to take over custody and control of the funds, in this case, does not strip the property of its benefits while leaving its burdens unclaimed; rather, keeping the receiver from obtaining those funds would separate the benefits from the burdens of the subject property." Furthermore, "[o]ut of an abundance of caution," the court specifically ordered that "this court will use its inherent equitable power to ensure that any property expenses, properly collectable and attributable to those proceeds collected after May 20, 2014, are payable by the receiver unless otherwise ordered by the court." Thus, the rents turned over to the receiver would have been used for the same types of expenditures for which defendant would have been authorized to use cash collateral.

¶ 68 Given our conclusion that the trial court properly ordered defendant to turn over the prereceivership rents to the receiver, we also can find no error in the trial court's ultimate order to turn over these funds to plaintiff, an alternate argument raised by defendant. In its August 18, 2015, order, the trial court ordered that "[u]pon dismissal of the bankruptcy case, [defendant] is directed to turn over all rents and any other receipts from the property—including, without limitation, CAM payments—collected after May 20, 2014, presently held in the DIP account, to the court-appointed receiver *** in his representative capacity, to be held by him for the preservation and maintenance of the subject property." This language used by the trial court simply rephrases a receiver's duties under the Illinois Mortgage Foreclosure Law (Foreclosure Law), which provides, *inter alia*, that the receiver "shall use reasonable efforts to maintain the real estate *** in at least as good condition as existed at the time the receiver took possession" (735 ILCS 5/15-1704(c)(2) (West 2014)) and that the receiver "may take other such actions as may be reasonably necessary to conserve the mortgaged real estate and other property subject to the mortgage, or as otherwise authorized by the court" (735 ILCS 5/15-1704(c)(9) (West 2014)). Indeed, it is well established that "[a] receiver *** is 'an officer of the court' appointed to 'secure and preserve property for the benefit of all concerned.' " *United States Fidelity & Guaranty Co. v. Old Orchard Plaza Ltd. Partnership*, 284 Ill. App. 3d 765, 774 (1996) (quoting *Heritage Pullman Bank v. American National Bank & Trust Co. of Chicago*, 164 Ill. App. 3d 680, 687 (1987)).

¶ 69 The Foreclosure Law also details and prioritizes the allocation of receipts collected from operation of the real property, including that, after payment of the enumerated expenses, "the balance, if any, shall be held or disbursed as ordered by the court." 735 ILCS 5/15-1704(d)(8) (West 2014). In the case at bar, the trial court ordered that, after the payment of expenses, "[t]he Receiver shall transmit all property and any remaining funds on hand in the amount of $594,782.80 to the Plaintiff *** for application to the deficiency judgment," which the trial court had previously found amounted to $1,276,008.47. We can find no error in the trial court's ordering the funds remaining in the receiver's account to be applied to the outstanding deficiency judgment. Defendant provides no support for its argument that that it was entitled to the $278,341.10 in prereceivership rents because "these pre-receivership funds were not necessary, and not used, to 'preserve or maintain' the Property," and we do not find this argument persuasive.

¶ 70                                    II. Payment to Milestone

¶ 71 Defendant next argues that the trial court erred in denying defendant's request that Milestone be paid for the property management services that it provided during the pendency of the bankruptcy action. Defendant provides no legal support for its argument, which consists

of a single paragraph of its brief on appeal.[13] Nevertheless, we can find no error in the trial court's conclusion.

¶ 72    As plaintiff points out, Milestone entered into a "Consent and Agreement of Manager" agreement on October 31, 2002, which provided, in relevant part:

"[T]he rights of the Undersigned under the Contract to receive any compensation reimbursement of costs and expenses or other payments in consideration for its management services for the Premises shall be and remain subordinate in all respects to the Lender's rights under Loan Documents."

Thus, Milestone expressly agreed that its right to receive payment for its services would be subordinate to plaintiff's rights under the loan documents, and the trial court therefore properly found that Milestone was not entitled to be paid from the prereceivership rents where there remained a deficiency judgment in plaintiff's favor to which those rents were applied.

¶ 73    Defendant's response to plaintiff's argument is that this agreement "was not before the trial court and should not have been a basis for the decision to deny the request" because Milestone was not named as a party. However, we note that defendant, not plaintiff, is the one that brought Milestone into this action by seeking payment for Milestone's management fees, so its attempt to place fault on plaintiff for not naming Milestone as a party is unpersuasive. We further note that the document that defendant claims "was not properly before the trial court" was provided by defendant itself, as an exhibit to its brief concerning the Milestone invoices. Defendant cannot submit a document to the court and then later claim that the document "was not properly before the trial court." Accordingly, we are not persuaded by defendant's arguments and find that the trial court properly concluded that the contract executed by Milestone was dispositive as to its ability to receive payment.

¶ 74                                              III. Attorney Fees

¶ 75    Finally, defendant contends that the trial court erred in awarding plaintiff attorney fees. In the judgment of foreclosure and sale, the trial court found that plaintiff was entitled to $663,389.01 in legal expenses, as well as $30,190.31 in servicer expenses. Defendant claims that the trial court erred in awarding attorney fees because plaintiff did not properly support its request for the fees and the awarded fees were excessive.

¶ 76    Under the Foreclosure Law, "[a]ttorneys' fees and other costs incurred in connection with the preparation, filing or prosecution of the foreclosure suit shall be recoverable in a foreclosure only to the extent specifically set forth in the mortgage or other written agreement between the mortgagor and the mortgagee." 735 ILCS 5/15-1510(b) (West 2014). In the case at bar, in its request for attorney fees, defendant listed three locations in the loan documents that provide for the recovery of attorney fees: section 2.5 of the note and sections 3.1(e) and 3.7 of the mortgage.

¶ 77    Section 2.5 of the note provides that "[i]n the event that this Note, or any part hereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection, including, but not limited to, reasonable attorneys' fees." Section 3.1(e) of the mortgage provides, in relevant part, that "[i]n the event foreclosure proceedings are instituted by Mortgagee, all expenses incident to such proceedings, including, but not limited to, reasonable

---

[13]Its reply to plaintiff's response brief consists of two paragraphs with one case citation.

attorneys' fees and costs, shall be paid by Mortgagor and secured by this Mortgage and by all of the other Loan Documents securing all of any part of the Debt." Section 3.7 of the mortgage provides, in relevant part:

> "Mortgagor shall pay on demand all of Mortgagee's expenses incurred in any efforts to enforce any terms of this Mortgage, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, reasonable legal fees and disbursements, foreclosure costs and title charges ***.

> In addition and without limitation of any amounts expended by Mortgagee pursuant to Section 3.3 hereof, in any suit to foreclose the lien hereof or in any other action to enforce any other remedy of Mortgagee under this Mortgage or with respect to any of the Debt, there shall be allowed and included as additional indebtedness in the decree for sale, judgment of foreclosure or other judgment or decree all reasonable expenditures or expenses which may be paid or incurred by or on behalf of Mortgagee for attorneys, appraisers, consultants and contractors ***. All expenditures and expenses of the nature in this Section mentioned and such expenses and fees as may be incurred in the protection of the Premises and the maintenance of the lien of this Mortgage, including but not limited to the reasonable fees of any attorney employed by Mortgagee in any litigation or proceedings affecting this Mortgage, the Debt or the Premises, including, without limitation, bankruptcy proceedings, or in the preparation for the commencement or defense of any proceeding or threatened suit or proceeding, shall be immediately due and payable by Mortgagor, with interest thereon from the date incurred at the Default Rate and shall be secured by this Mortgage."

¶ 78    In the case at bar, defendant first argues that plaintiff's request for attorney fees was not properly supported, so defendant was unable to challenge the reasonableness of the fees. "Only those fees which are reasonable will be allowed, and the party requesting fees bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness." *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1072 (1993); *Aliano v. Sears, Roebuck & Co.*, 2015 IL App (1st) 143367, ¶ 19. "A petition for fees must present the court with detailed records containing facts and computations upon which the charges are predicated and specifying the services provided, by whom they were performed, the time expended and the hourly rate charged." *Chicago Title & Trust*, 248 Ill. App. 3d at 1072; *Aliano*, 2015 IL App (1st) 143367, ¶ 19. In assessing the reasonableness of fees, "[a] court may consider a multitude of factors, including the nature of the case, its difficulty level, the skill and standing of the attorney, the degree of responsibility required, the usual and customary charges for similar work, and the connection between the litigation and the fees charged." *3432 West Henderson Building, LLC v. Gizynski*, 2017 IL App (1st) 160588, ¶ 40. A trial court has broad discretion in awarding attorney fees, and its decision will not be reversed unless the court abused its discretion. *3432 West Henderson*, 2017 IL App (1st) 160588, ¶ 40. Additionally, "[t]he trial court's determination as to an appropriate award of attorney fees must be considered in light of the principle that the trial judge is permitted to use his own knowledge and experience to assess the time required to complete particular activities, and a court of review may not reverse an award of attorney fees merely because it may have reached a different conclusion." *Chicago Title & Trust*, 248 Ill. App. 3d at 1074.

¶ 79    In the case at bar, we cannot find that the trial court abused its discretion in its award of attorney fees. Attached to the motion for summary judgment, in which plaintiff made its

request for attorney fees, was a "schedule" of the invoices supporting plaintiff's request for attorney fees, redacted copies of which plaintiff claimed it had produced to defendant. The schedule listed 57 invoices dating from December 31, 2012, through September 9, 2015, 43 of which stated that they had been produced, and the schedule indicated that the invoices had a total value of $578,974.71, with $549,400.58 in fees and $29,574.13 in costs. Also attached to the amended motion for summary judgment was the affidavit of Gregory Akins, a senior vice president at plaintiff servicer, in which Akins averred that "[a]s of the date of this Affidavit, the Loan remains outstanding and the total amount due and owing under the Loan Document is $5,009,794.05, which consists of: *** (vi) legal expenses total[ling] $572,355.44 as of September 1, 2015." Akins further averred: "The fees and expenses detailed in Exhibits 4 and 5 were all incurred in connection with the Trust's efforts to enforce the Loan Documents and have been paid or are in the process of being paid." Finally, attached to the amended motion for summary judgment was an affidavit of Procida, a New York attorney who was a partner in the law firm retained by plaintiff servicer in connection with the foreclosure action; Procida averred that he had been allowed, pursuant to Illinois Supreme Court Rule 707 (eff. July 1, 2007), to represent plaintiff in the instant litigation and *pro hac vice* in the bankruptcy court and that, over time, he became the primary attorney working on the instant litigation. Procida averred that he was personally involved with the legal services rendered to plaintiff in connection with (1) the instant cause, (2) the bankruptcy case, (3) an adversary proceeding in bankruptcy court, and (4) a pending action in the circuit court of Cook County concerning a purported guaranty executed by defendant's principals. With respect to the issue of attorney fees, Procida averred:

> "9. The attorneys' fees charged by [the firm] are based upon the amount of time spent on a particular client matter. We keep track of our time by filling out time sheets on a daily basis. The information from those time sheets is then made into an itemized invoice by using our computer billing program. I occasionally review the invoices to assure the accuracy and reliability of this system of generating invoices, and I have found it to be reliable and accurate.

> 10. My billing rate during the life span of this case has ranged from $550 to $600 per hour. A detailed listing of the attorneys' fees incurred by the Trust with regard to the above-captioned cause is attached to the Motion as Exhibit 4 and redacted invoices of all legal fees and expenses incurred through August 31, 2015 have been produced to [defendant].

> 11. I defer to the Court for the determination of the customary hourly rate for a Chicago attorney of similar experience. However, I note that [defendant's] lead counsel for the majority of this case *** has an hourly billing rate of $530."

¶ 80    In addition, after defendant argued that the motion lacked sufficient documentation to support the request for attorney fees, plaintiff supplemented the motion with additional copies of the timesheets that were less redacted, in addition to providing a fully unredacted copy of the timesheets to the trial court for *in camera* review. We cannot find that the request for attorney fees was thus unsupported and, to the extent that the exhibits attached to the motion for summary judgment were not sufficient, any deficiencies were cured by plaintiff's later supplements. See *Lake County Trust Co. v. Two Bar B, Inc.*, 238 Ill. App. 3d 589, 600 (1992) (finding that, to the extent original affidavit was insufficient, a supplemental affidavit remedied the alleged deficiencies).

- 23 -

¶ 81    Furthermore, we cannot find that the trial court abused its discretion in finding the fees sought by plaintiff to be reasonable. The trial court conducted a hearing on the issue of attorney fees on May 20, 2016, but no transcript of this hearing appears in the record on appeal. We note that, during oral argument, defendant's counsel suggested that there was no such hearing. However, the record on appeal makes clear that the trial court heard additional arguments concerning attorney fees at a hearing separate from the March 25, 2016, hearing that is included in the record. The record further makes clear that it was at this subsequent hearing that defendant made its arguments concerning specific fees—defense counsel specifically noted during the March 25, 2016, hearing that "[t]he reasonableness of fees, I'll save that until next time."

¶ 82    As noted, "[t]he trial court's determination as to an appropriate award of attorney fees must be considered in light of the principle that the trial judge is permitted to use his own knowledge and experience to assess the time required to complete particular activities, and a court of review may not reverse an award of attorney fees merely because it may have reached a different conclusion." *Chicago Title & Trust*, 248 Ill. App. 3d at 1074. Since we have no way of knowing what occurred at the hearing, we have no basis for disagreeing with the trial court's determination that these fees were reasonable. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (an appellant has the burden of presenting a sufficiently complete record of the proceedings at trial to support a claim of error and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis). Accordingly, we affirm the trial court's award of plaintiff's attorney fees.

¶ 83    Finally, we note that defendant did not request an evidentiary hearing on the issue of the reasonableness of plaintiff's attorney fees. "The reasonableness of fees is a matter of proof, and a party ordered to pay attorney fees has the right to conduct meaningful cross-examination on the issue." *Bank of America National Trust & Savings Ass'n v. Schulson*, 305 Ill. App. 3d 941, 952 (1999). "When a party who must pay attorney fees asks for an evidentiary hearing, he is entitled to one." *Schulson*, 305 Ill. App. 3d at 952. In the case at bar, if defendant had requested an evidentiary hearing, counsel would have had the opportunity to test the reasonableness of plaintiff's requested fees through cross-examination as to the basis of the fees and would have been able to present evidence challenging those fees. "The purpose of an evidentiary hearing is to provide sufficient information to allow the court to assess intelligently the reasonableness of the fees charged [citation] ***." *Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551, ¶ 127. "Generally, in protracted litigation involving multiple complex issues, an evidentiary hearing should be conducted on the request of the losing party, especially if the prevailing party was represented by multiple attorneys, which may have resulted in duplicative charges, and where the prevailing party was entitled to fees and costs with respect to some claims, but not others." *WS Management*, 2015 IL App (1st) 132551, ¶ 127 (citing *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1058 (2007)). In the absence of such a hearing, the basis for the trial court's determination would have been the evidence presented by plaintiff in support of its fee request, including its affidavits and invoices, and the arguments of the parties. As noted, given the fact that we are unable to know what occurred at the May 20, 2016, hearing, we cannot find that the trial court abused its discretion in determining that plaintiff's requested fees were reasonable.

## CONCLUSION

For the reasons set forth above, we find that the trial court properly ordered defendant to turn over the prereceivership rents to the receiver and did not err in ordering those rents to be later disbursed to plaintiff. We further find that the trial court properly denied defendant's request that the Milestone invoices be paid from the prereceivership rents. Finally, we find that the trial court did not abuse its discretion in awarding plaintiff attorney fees as provided by the loan documents.

Affirmed.